Walfred T. JANDEL, Patricia R. Jandel, Plaintiff,

v.

PRECISION COLORS, INC. et al., Defendants.

In the Matter of Walfred T. JANDEL, Patricia R. Jandel, Debtors.

Adv. No. 3–80–0659.

Bankruptcy No. 3–80–02832.

United States Bankruptcy Court, S. D. Ohio, W. D.

April 13, 1982.

George Ledford, Englewood, Ohio, trustee.

Charles W. Slicer, Sr., Dayton, Ohio, for defendants.

Thomas R. Noland, Dayton, Ohio, for plaintiffs.

## DECISION AND ORDER

CHARLES A. ANDERSON, Bankruptcy Judge.

### FINDINGS OF FACT

Debtors, Walfred T. Jandel and Patricia R. Jandel filed for relief on 12 September 1980 pursuant to Chapter 13 of Title 11. At the time Debtor, Walfred T. Jandel, was President of Precision Colors, Inc. (hereinafter P.C.I.), earning $850.00 per week which was to be part of the funding under the proposed Plan.

The proposed Plan offers to creditors (secured $175,000.00 ± and unsecured $100,-000.00 ± ) 100% payment of all allowed claims over a period of 60 months, or until paid prior to sixty months, to be funded by payments to the Trustee from income, and by a sale of Debtors' stock in Precision Colors, Inc., to the extent that the monthly payments are insufficient to pay all claims in full. The First National Bank of Dayton would be paid first from the proceeds "in order to release Debtors' stock in said Corporation from the pledge of such shares to said creditors."

After the Bankruptcy Court jurisdiction attached, Joseph E. Lyons, Edwin Fite, Everett C. Karas, C. J. Hoying, and Donald Hochwalt, the minority shareholders of Pre-

cision Colors, Inc., obtained an assignment of Jandels' stock, which had been pledged to The First National Bank of Dayton as collateral for a loan in the amount of $38,-841.40, and an assignment of the promissory note held by the Bank by advancing payment of the loan. The value of the stock interest, however, was then valued as high as in excess of $600,000.00.

The Debtors (as holders of a majority interest of the voting stock of the Corporation), called a shareholders meeting for 23 October 1980 to re-elect a Board of Directors. Before such a meeting could be held, the minority Class A shareholders on 22 October 1980 caused an assignment of the shares of the Jandel stock and note held by First National Bank of Dayton to themselves (or the voting rights, of which the evidence is not clear). At the shareholders meeting on October 23, the minority shareholders then asserted the right to vote Debtors' shares and this meeting was closed without any action. The corporate minute book does not reflect this meeting. The corporation records indicate that Mr. Jandel's "personal business problems" were discussed at a meeting of the Board of Directors on December 21, 1979, in his absence. At a special meeting of the Board on October 7, 1980, the "chief topic for discussion had to do with the filing by Mr. and Mrs. Jandel of a voluntary case in the Federal District Court of a Debtor's Joint Petition...." The notice of this special meeting had not been served on the Debtors. There ensued an extensive discussion concerning a course of action to be pursued by the corporation, the valuation of P.C.I. stock in the name of the Debtors and a transfer of the stock pledged by Debtors to First National Bank and the legal ramifications of stock transfer restrictions.

By this maneuver the minority stockholders gained control of the corporation by a nominal investment and proceeded by a vote of a reconstituted Board of Directors to dispose of Walfred Jandel as President and Chief Executive Officer of the Corporation and as a member of the Board of Directors, rendering him thereby unemployed and having no income to fund the proposed Chapter 13 Plan. At the time that the Chapter 13 case was instituted, the stock owned by the Jandels represented 54.4% of the voting control in the corporation. The Jandels were at that time shareholders holding 300 Class A Shares and 800 Class B Shares and, even though both Jandels were on the Board of Directors of P.C.I. at the filing of the Chapter 13 Petition, they never had notice of any action to remove them from the Board. Mr. Jandel was advised that he had been removed as President of P.C.I. on or about 8 October 1980.

Various challenges have been made in behalf of Debtors to the manner and legality of the conduct of the corporate affairs. The Chapter 13 process does not afford direct jurisdiction, however, over the corporate affairs, notwithstanding a very suspicious maneuver to obtain control over the Corporation by the minority shareholders.

Because of an apparent interference with the Chapter 13 estate, in light of the potential diminution of the scheduled values of the Jandel stock and interference with and impairment of the rights of other claimants to participate in a proper distribution of the estate existing when the case was filed, this Court ordered the minority stockholders to be reimbursed for the $39,000.00 + disbursed to the Bank effecting a release of the Bank security interest on the Jandel stock, and impounded the Jandel stock assigned by the Bank after the jurisdiction had vested, to be held by the standing Chapter 13 Trustee for protection of the estate, until further order, pursuant to 11 U.S.C. § 105(a). Further factual details giving rise to the order to impound the Jandel shares of stock need not now be reiterated. See *Jandel v. Precision Colors, Inc. et al., (Matter of Jandel)* 8 B.R. 855, 7 B.C.D. 320, CCH ¶ 67946 (Bkrtcy.1981). The redemption of the Jandel stock was then effected by payment to the minority stockholders by funds furnished by Debtors.

The business of the corporation has been conducted by the minority shareholders since Walfred Jandel was deposed as chief

executive officer, and there is some indication that, for obvious reasons, the business has suffered since the internecine struggles for control ensued.

After the stock of the Jandels had been impounded with the Chapter 13 Trustee, the corporation internecine controversies continued, with resulting deterence on administration of the Chapter 13 case. The most serious impairment has been a lack of cooperation between the contending shareholders necessary to obtain a worthwhile, disinterested appraisal of the value of the Debtors' stock, including sufficient financial data to solicit feasible offers to purchase either the assets of the corporation or the stock. Charges and countercharges, request for discovery and sanctions, and other procedural ingenuities have been indulged over the inspection of the physical assets of the business and the corporation financial records.

At a special Board of Directors meeting attended by the minority shareholders of P.C.I. on July 30, 1981 (again without notice to the Debtors) this Chapter case again was under consideration, and the legal options for the corporation. "(I)t was agreed unanimously that Mr. Slicer would be and he was at that time authorized to pursue all of the legal considerations relative to changing the voting structure of the outstanding stock of the corporation to such an extent that the 20 votes per share on the Class B Stock would be eliminated and the net result would be that the voting power of the stock would be based upon the valuation of the shares outstanding. The result of this move would be to reduce, apparently, the voting power of the Jandels from 55% to 44% and Mr. Slicer was authorized to explore the necessity for amending the Articles of Incorporation...."

The minutes of a special Board meeting held December 23, 1981, (again without notice to Debtors) reflect that the attorney for Debtors had been apprised of the "Morrison Printing Ink Co. proposal" effect on the Debtors' estate and would "recommend to Mr. Ledford and to the Court ... [approval] by the Court, the Trustee and the stockholders...."

The last documented special Board of Directors meeting was held on March 5, 1982 (again without notice to the Debtors) at which the Morrison Printing Ink Co. purchase proposal (of January 26, 1982) was "reapproved" and Charles W. Slicer was authorized to confer with its attorneys "with respect to all aspects of the scheduled hearings," (referring to the March 19, 1982 hearing).

Because the internecine maneuvering seemed interminable, the Chapter 13 Trustee directly interceded by serving notice of sale on February 13, 1982, that he "as custodian of the stock of Walfred T. Jandel and Patricia R. Jandel in Precision Colors, Inc. ... will be voted by the Trustee in support of that certain asset purchase agreement (draft copy of 1–26–82), whereby the corporation will be sold to Morrison Printing Ink Co. The Debtors estate herein will receive approximately $132,000.00 from the sale. All liens on Jandels' stock will attach to the estate sale proceeds for further determination by the Court. The sale will be consummated unless an interested party requests a hearing within 10 days thereof."

On 2 March 1982 the Debtors filed objections to the Notice of Sale asserting numerous reasons for disallowance, including a denial that the Trustee has a right to vote the stock or that a valid offer is before the Court; and, that the only valid offer which will benefit the estate and creditors is one by Robert W. Dieffenbach and Stuart Siegel to purchase the Debtors' stock, netting $140,000.00 directly into the estate.

Since the stock was impounded by Court Order, the Debtors have sought purchasers for their shares, without success, until March, 1982, when an offer was tendered by Dieffenbach and Siegel. Notice of an application to sell the Jandel stock free and clear of all liens, encumbrances, and restrictions, was given to all of the creditors of the Debtors and to the shareholders of P.C.I., requiring objections to said sale to be made in writing on or before March 17, 1982. Only one objection was filed, that on 17 March 1982 in behalf of P.C.I. and/or in

behalf of Messrs. Lyons, Fite, Karas, Hoying and Hockwalt, the minority stockholders.

At the time of the hearing set by the Court (on 19 March 1982) additional offers and counter-offers were orally proposed. It was finally ordered in open court that the interested parties submit final sealed bids to be considered as evidence in a determination order resolving the controversy.

The Trustee indicated his offer had been submitted primarily as a catalyst to avoid further procrastinations, and that he would defer to the sealed bids.

The minority shareholders support the "Morrison bid;" and, the majority shareholders (Debtors) support the "Dieffenbach-Siegel bid." The Court withheld disclosure of the terms of the sealed bids pending final submission of the issues of law.

Even though the minority shareholders tendered and supported the Morrison bid, they expressly reserved the right to question the transferability of the corporate stock held by the Debtors as proposed. They also reserved the right to question the jurisdiction of the Court over the sale of the Debtors' corporate stock through the Chapter 13 process. The record is not clear, and the parties have been somewhat ambiguous, as to whether the support of the Morrison bid is by the corporation directly or by the minority shareholders individually.

In the same vein the Debtors as supporters of the Dieffenbach-Siegel bid did not waive the right to question the validity of the corporate approval of the sale of all of the corporate physical assets under the Morrison bid without the unanimous consent of all shareholders.

Precision Colors, Inc., was incorporated on 17 August 1965. The maximum number of shares which the corporation was authorized to have outstanding was 500 Common, no par voting stock. The amount of capitalization to begin business was fixed at $20,000.00. The original shareholders were W. T. Jandel with 100 shares and Patricia R. Jandel with 100 shares. On 30 July 1966 the Articles of Incorporation were amended to provide, in pertinent part, that the original authorized and issued 500 shares of Common, no par, voting stock of the corporation be exchanged for 500 shares, Class A, no par, non-dividend with 20 votes per share. All shares of the Class A capital stock would bear the following restrictions on sale and transfer, namely:

"None of the Class A common stock of Precision Colors, Inc. shall be sold or transferred in any manner whatsoever to any person, partnership or corporation without first being offered to the stockholders holding Class A common stock or to the Corporation Precision Colors, Inc. Written notice of the contemplated sale or transfer of such shares shall be given to the corporation by certified mail as its principal place of business and the corporation shall notify the Class A common verified shareholders of the contemplated sale or transfer by regular mail verified by the office of the Secretary. The Class A common shareholders or the corporation may then purchase such shares within 90 days of the date of receipt of said notice by the corporation for the original subscription price of $100.00 per share. The Class A common shareholders may exercise their right to purchase such shares by depositing the purchase price with the Corporation before the expiration of the 90-day period. Determination of priority for allocation of shares to purchasers shall be at the sole discretion of the board of directors. If the Class A shareholders fail to deposit the purchase money within said 90-day period or the corporation fails to buy direct within said time then the shares may be sold or transferred to anyone but subject to this restriction as to future sales."

In the same amendment to the Articles of Incorporation Precision Colors, Inc., was authorized to issue three thousand shares of Class B, Common, no par, voting, dividend participating stock at a sale price of $25.00 per share. At the time that the Articles were so amended, W. T. Jandel was President and Patricia R. Jandel was Secretary of the Corporation. The share certificates issued in 1966 to the Jandels contained the

restriction on the certificates but the shares issued in 1970 failed to contain the restriction on the certificates. The record does not disclose whether the other Class "A" shares issued contained the restriction on the share certificates.

Notice of the application to sell the Jandels' stock free and clear of all restrictions was mailed to all creditors and also to the shareholders of Precision Colors, Inc.

Conformably to the Order at Bar specifying final, sealed bids, two bids were duly filed, accompanied by the specified irrevocable Letters of Credit in the amount of 20% of the bids. One bid was submitted in behalf of "Precision Colors, Inc. and Shareholders," in the blanket amount of $185,000.00. The other bid was submitted in behalf of Robert W. Dieffenbach and Stuart L. Siegel in the amount of $180,000.00 with the additional stipulation that the bid carries a 5-year employment agreement for W. T. Jandel, with weekly compensation of $850.00.

## CONCLUSIONS OF LAW

Several arguments have been presented in behalf of the combatting stockholders. The matter can be resolved without resort to the "clean hands" doctrines in a court of equity, from which both factions are not entirely immune. The various postures assumed by the contesting parties all devolve into a struggle for control of a corporation not subject to this Court's jurisdiction as a Debtor. The primary thrust of the Court's jurisdiction is to preserve the value of the Chapter 13 estate for the benefit of all creditors and interested parties, acknowledging a gradual and understandable deterioration because of litigation among the corporate interests.

It should be made clear that there is no evidence which implicates either purchase offerors in bad faith or inequitable motivations. Their postures are concerned only with acquiring good, unencumbered, marketable title. The effects of the proposed "sell outs" on the value of the shares of the minority shareholders, nevertheless, cannot be obviated independently of the struggle for control of the corporation, which is in most aspects ancillary to either offer (especially a stock purchase take over of a two-tier variety).

The *ratio decidendi*, therefore, will discount the well researched arguments relative to any waivers by operation of law (or equity) of the rights of the minority shareholders either of a contractual nature (stock sale restrictions) or statutory imposed by the General Corporation Act of the State of Ohio.

The only waiver cognizable is the unanimous consent of all stockholders to use 30 April 1982 as the cut off date for acceptance of the highest and best offer.

■ This Court concurs in the interpretation by Defendants (minority shareholders) of 11 U.S.C. § 363(f), that the sale of Debtors' stock "free and clear of any interest in such property of an entity other than the estate" contemplates such action only to remove a "lien" and that the stock sale restriction is not such a "lien."

Such a restriction on the transferability of shares by shareholders are common in closely held corporations as a contractual right because the original shareholders, as a tightly knit group, want to assure that the shares will not pass to strangers incompatible to the group. See Cavitch: *Ohio Corporation Law*, Section 211(2)(f), citing § 1701.04(B)(1)(2) of Ohio Revised Code. As a contractual matter, the fact that one stock certificate issued to the Debtors did not contain a recitation of the restriction now involved is not crucial since the Debtors had personal knowledge as Directors and Officers of the Corporation when the applicable Articles of Incorporation were adopted.

11 U.S.C. § 101(28) which defines "lien" to be a "charge against or interest in property to secure payment of a debt or performance of an obligation," must be read *in pari materia* with other provisions of the Bankruptcy Code, even though phrased in such an all encompassing fashion as to avoid litigation concerning the nature of the various types of liens and security inter-

ests applicable in the various states by common law or statutes and the federal statutes. The provision should not be interpreted, nevertheless, in such a manner as to warp nonbankruptcy law beyond recognition. The use of such a broad semantics is meant only to be certain of encompassing Bankruptcy Code concepts of judicial liens (11 U.S.C. § 101(27)), recognized security interests in real as well as personal property (11 U.S.C. § 101(37)), and statutory liens (11 U.S.C. § 101(38)). There is no ascertainable Congressional intent to impose a super lien to encompass all contractual relationships. We note that a lien upon a security in favor of the issuer thereof is valid only if such a lien is noted conspicuously on the stock certificate, not the fact *instanter.* Ohio Revised Code § 1308.02 (UCC 8–103).

Having concluded that the shares of stock not a part of the estate cannot be sold free of the contractual rights of the minority shareholders in the guise of a lien does not resolve the rights of the estate subject to court direct jurisdiction. Possession and control over this *res* has been previously exercised by impoundment of the stock. The rights of the Debtors as controlling stockholders must be implemented for the maximum relief of both the Debtors, and more importantly, the creditors in the case.

The minority shareholders have evidenced considerable disregard of the traditional rights of the estate shares, such as the right to participate in the selection of management, to inspect the books of the corporation, to notice of meetings, the right to vote, and the right to assign or transfer shares to another. See extensive discussion and annotation in Ohio Jurisprudence 3d *Business Relationships* §§ 506, 533 et seq., 545, 556 et seq.

Ohio has by statute adopted the common law rule approving proper restrictions on the alienation or transfer of corporate stock. R.C. §§ 1705.18; R.C. 1701.11(B)(8); 1308.02 (U.C.C. 8–103); R.C. 1308.09 (U.C.C. 8–204); R.C. 1701.11(B)(8); R.C. 1701.25(B); R.C. 1701.35(A)(5).

The restriction is not invalid as an unreasonable restraint on alienation; rather, it is a typical "buy-out" or "first action" agreement, completely binding upon all shareholders as a contractual right voluntarily established by the shareholders, for which extensive citations of legal authority would only be vain. See 18 Am.Jur.2d *Corporations* §§ 387 et seq. The rights of the Debtors under Chapter 13 can rise no higher. See 11 U.S.C. § 541(a)(1) and (c)(1).

### III

█ Even though the court would prefer to confirm a sale not only in the best interest of estate creditors, but also in the nature of a voluntary sale by all stockholders, the obvious impairment of the economic value of the Debtors' stock cannot be countenanced beyond the April 1 cut off date established by all of the stockholders. The stock in the Debtors' estate, previously impounded with the Chapter 13 Trustee, must as soon as possible be liquidated either by the consensus of all contractual parties or as a judicial sale in behalf of the estate creditors pursuant to the "strong arm" provisions carried from former statutes into 11 U.S.C. § 544, and applicable in Chapter 13 conformably to 11 U.S.C. § 103(a). The sale would be in behalf of the creditors having a judicial lien and an execution against Debtors returned "unsatisfied." Even though not controlling *instanter,* see these principles discussed and applied in other courts *In re Trilling and Montague,* 140 F.Supp. 260 (D.C.Pa.1956); *Barrows v. National Rubber Co.,* 12 R.I. 173; *McDonald v. Farley & Loetscher Mfg. Co.,* 226 Iowa 53, 283 N.W. 261.

Despite the "strong arm" execution creditor principles, the contractual stock sale restriction should be implemented to the extent there is no interference with the purposes and intent of the Bankruptcy Code. Furthermore, the exceptions to enforcement applicable to judicial sales should be applied, in any case, to modify the rights of dissenting stockholders only as to procedural implementation and not to defeat substantive rights. Neither the "strong arm" clause nor the judicial sale exception, in general, mandates the automatic invalida-

tion of the transfer restrictions. The rights of minority and dissenting shareholders are equally worthy of protection in all other respects. They should be afforded first refusal rights until the consensus date (30 April 1982). If the facts had warranted, the Debtors' estate would have been similarly protected by a stock purchase proposal for the minority shares.

The following conclusions are reached on the issues and facts *sub judice.* The highest and best offer to the best interests of the estate is the proposal tendered by Robert W. Dieffenbach and Stuart L. Siegel in the amount of $180,000.00 with the additional stipulation that Debtor W. T. Jandel would receive a 5-year employment contract, at the compensation of $850.00 weekly, which would be enforced by the court for the benefit of the Debtors and the creditors. The total value, if the contract runs to term, would be enhanced by income to Debtors totalling over $230,000.00 from which a feasible Plan could be funded. The cash offer by P.C.I. and Minority shareholders would produce only $185,000.00 in one lump sum.

For the purpose of protecting the economic values of the minority shares of stock, the "first option" restriction on the stock should be honored in behalf of the shareholders to enable them to match the first and best offer by payment of equal economic values. Accordingly, it is

ORDERED, ADJUDGED AND DECREED that the offer by Dieffenbach-Siegel should be and is hereby, accepted subject to the right of P.C.I. or the minority shareholders to tender an equal offer before April 29, 1982 at 1:30 P.M.

ORDERED, ADJUDGED AND DECREED that all of the statutory rights of dissenting and minority shareholders under Ohio law should be and are hereby retained and continued in effect as to the transfer of the Jandel stock pending the successful consummation of a confirmed Plan, the continued employment of W. T. Jandel under the accepted offer, and the continued jurisdiction of the Bankruptcy Court over the estate, or until a voluntary transfer of the respective shares by a particular minority shareholder or shareholders before termination of court jurisdiction. Thus, a voluntary dismissal of the Chapter 13 case by Debtors or the termination of the employment income of W. T. Jandel under the stock sale would reinstate the minority shareholders' statutory rights otherwise terminated by the unqualified and unrestricted transfer of the stock by this Order.