**Wayne PREYER, Plaintiff,**

**v.**

**GULF TANK & FABRICATING CO., INC. and Bay Tank & Fabricating Co., Inc., Defendants.**

**No. 90–50142–RV.**

United States District Court,
N.D. Florida,
Panama City Division.

May 5, 1993.

Jerry G. Traynham, Tallahassee, FL, for plaintiff.

Rob Blue, Jr., Panama City, FL, for Bay Tank.

## ORDER GRANTING PARTIAL SUMMARY JUDGMENT

VINSON, District Judge.

Pending is plaintiff's motion for partial summary judgment (doc. 27), and defendants' cross-motion for summary judgment (doc. 41). For the reasons set out below, plaintiff's motion is GRANTED and defendants' motion is DENIED.

### I. BACKGROUND

Except where noted, the following facts are undisputed.

### A. *Gulf Tank And The Sale Of Its Assets To Dixie Steel.*

Defendant Gulf Tank & Fabricating Co., Inc. ("Gulf Tank") was originally incorporated under the laws of Florida in October 1958. Until December 1982, it was engaged in the manufacture of products from steel plate.[1] Throughout the time it was so engaged, its only manufacturing facility was located in Panama City, Florida.

Until its involuntary dissolution by the Secretary of State on July 19, 1988, Gulf Tank was closely associated with an Alabama corporation known as Dixie Steel & Supply Co., Inc. ("Dixie"). Throughout Gulf Tank's existence, several of Dixie's officers and directors also served as officers and directors of Gulf Tank. In particular, Charles A. Snyder, John H. Lawrence, and Conrad Wesselhoeft owned a majority of the stock of both corporations, and all three served simultaneously as officers and directors of both companies.

In 1965, after spending a year's employment as an engineer with Dixie in Tuscaloosa, Alabama, Terrance B. Wyatt came to Gulf Tank as its general manager. Beginning in 1966, Wyatt also served as Gulf Tank's regis-

---

1. Gulf Tank was incorporated in 1958 under the name Gulf Engineering & Marine Corporation. Sometime around 1967 it began doing business under the name "Gulf Tank & Fabricating Company." In 1970 it filed an amendment to its articles of incorporation with the Secretary of State of Florida officially changing its name to Gulf Tank & Fabricating Co., Inc. Its name frequently is stated as Gulf Tank & Fabricating Company, Inc. For convenience, I will generally refer only to "Gulf Tank."

tered corporate agent in the State of Florida. Eventually, Wyatt became an officer and a director of Gulf Tank. By 1982, he also had acquired approximately 22% of its issued and outstanding stock. During 1982 Dixie and Gulf Tank discussed plans to bring the "Gulf Tank operation" into Dixie Steel.

Effective December 31, 1982, Dixie and Gulf Tank entered into a plan of "restructuring" under which Dixie purchased all of the operating assets of Gulf Tank, leaving Gulf Tank & Fabricating Co., Inc. with only Dixie's note, and some smaller notes receivable, as assets. Gulf Tank, at least internally, became the "Gulf Tank Division of Dixie Steel & Supply Co., Inc." ("Gulf Tank/Dixie"). As part of the restructuring, Wyatt became the general manager of Gulf Tank/Dixie.

This change was effected without any noticeable interruption or change in operations at the Panama City works. Gulf Tank/Dixie acquired all of Gulf Tank's accounts receivable, materials, and works in progress. It continued to manufacture steel plate products using the same facilities, equipment, and personnel as Gulf Tank.

The record reflects that, beginning in February 1983, Preyer's payroll checks were from "Gulf Tank Division of Dixie Steel & Supply Co., Inc." The change was not publicly acknowledged, however, until later. Throughout 1983, Dixie continued to operate Gulf Tank/Dixie under the name "Gulf Tank & Fabricating Co., Inc." It bid projects, took orders, and billed customers under the old name, and maintained a listing under the name "Gulf Tank & Fabricating Co., Inc." in the Yellow Pages of the Bay County Telephone Directory. It was not until 1984 that Dixie began using the name "Gulf Tank Company, a Division of Dixie Steel & Supply Co., Inc." on company papers such as invoices, dray tickets, shop orders, and bid proposals. At about the same time, it began using the name "Gulf Tank Co." in its yellow pages listing. However, the telephone number and address remained the same. There is no record of the registration of the name "Gulf Tank Company" in the State of Florida.

Although it was no longer an operating business, Gulf Tank continued to exist as a corporation. It continued to file annual reports with the Secretary of State of the State of Florida, and the corporate minutes reflect post–1982 shareholders' and directors' meetings. After the December 1982 restructuring, however, its only significant asset consisted of a subordinated note from Dixie in the principal amount of $999,423.50, representing the purchase price of its assets. In June 1983, Gulf Tank's directors voted to convert $300,000.00 of this debt into shares of Dixie's stock. Gulf Tank's balance sheet for January 31, 1984, reflected total assets of $1,406,860 and total liabilities and income tax reserve of $1,264,454, leaving a stockholders' equity of $142,406.

At this point, Gulf Tank had five directors. They were John H. Lawrence, Oscar Allen, Conrad Wesselhoeft, Charles Snyder and Terry Wyatt. Of these five, Lawrence, Wesselhoeft, and Snyder also served as Dixie's only officers and directors. In addition, Wyatt served as the registered agent of both Dixie and Gulf Tank.

Wyatt resigned from his position as Gulf Tank's registered agent, effective June 9, 1987. Gulf Tank apparently did not appoint another agent, and on April 29, 1988, the Department of State of the State of Florida mailed Gulf Tank a notice of its intent to dissolve the corporation in sixty days pursuant to Section 607.271, Florida Statutes. Gulf Tank did not respond, and therefore, was involuntarily dissolved on July 19, 1988. The record does not reflect what disposition, if any, has been made of any remaining Gulf Tank assets.

### B. *Preyer's Employment With Gulf Tank*

Beginning in 1973, Gulf Tank employed the plaintiff, Wayne Preyer, as a welder at its Panama City works. The 1982 restructuring does not appear to have affected Preyer's employment, and he continued in this capacity until his discharge on October 10, 1983. After he was fired from his job, Preyer filed a complaint in this court on November 18, 1983, alleging various violations of the Labor Management Relations Act [29 U.S.C. §§ 185 *et seq.*], and the Civil Rights Act of 1870 [42 U.S.C. § 1981].

Although, as described above, Preyer worked for Dixie during 1983, the complaint named Gulf Tank and Local 109 of the International Brotherhood of Boilermakers, AFL–CIO, as the only defendants. Apparently, Preyer had no knowledge of the 1982 restructuring, and Gulf Tank made no effort to inform either Preyer or this court of the change in ownership of the corporation's assets.[2] Therefore, Preyer sued his perceived employer, Gulf Tank, but Dixie was then his real employer.

Throughout the ensuing litigation, Wyatt acted as Gulf Tank's representative. He met with Gulf Tank's attorneys, answered interrogatories, gave deposition testimony, and testified at trial on Gulf Tank's behalf. There is nothing in the record to indicate that anyone on behalf of Gulf Tank attempted to correct the fact that Gulf Tank was not the proper party defendant.

Preyer's Section 1981 claim against Gulf Tank went to trial in February 1985. The jury returned a verdict in his favor in the amount of $35,000.00. This court then entered judgment against Gulf Tank & Fabricating Co., Inc. on February 26, 1985. Thereafter, action was deferred on Preyer's request for equitable relief pending Gulf Tank's appeal. On March 10, 1986, the Eleventh Circuit Court of Appeals affirmed the judgment, and it became final.

## C. Sale of Assets from Dixie Steel to Bay Tank

On November 25, 1985, while the appeal was pending, Wyatt and another investor, Lorenzo N. Dantzler, entered into an agreement to purchase substantially all of the assets of Dixie's Gulf Tank Division (i.e. Dixie's Panama City steel fabrication facilities that formerly belonged to Gulf Tank). They then assigned their interest in the agreement to a newly-formed corporation, the defendant Bay Tank & Fabricating Co., Inc. ("Bay Tank").[3] In return, Bay Tank accepted the assignment, assumed the purchaser's obligations, and agreed to indemnify Wyatt and Dantzler from any liability under the agreement.

Pursuant to the agreement and subsequent assignment, Bay Tank acquired Dixie's Gulf Tank Division, i.e. the Panama City manufacturing facility, the office equipment and furnishings located there, Gulf Tank/Dixie's equipment leases, all finished goods, all work in progress, all raw materials inventory, Gulf Tank/Dixie's books and records, its trade accounts receivable, its rights under contracts, deposits with municipalities and public utilities, as well as all other tangible and intangible property used in or for steel plate manufacturing, development, and sales. The agreement also provided for retroactive accounting whereby Bay Tank became "entitled to the results of operations and [bore] the burden of operations from October 1, 1985."

In an effort to "downsize" after the transaction, Wyatt (who was general manager of Bay Tank after the sale was consummated) eliminated some of the heavier manufacturing equipment and attempted to focus more on the fabrication of pressure vessels. Nevertheless, it is undisputed that Wyatt and Dantzler purchased Dixie's Gulf Tank Division as a going concern, and that Bay Tank subsequently continued to engage in the general steel fabrication business using most of the same facilities and the same employees as Gulf Tank/Dixie and Gulf Tank had used before it.

At the time they agreed to purchase Gulf Tank/Dixie, both Wyatt and Dantzler knew of the Preyer litigation. Although Wyatt stated in his deposition that, during the negotiations leading up to his purchase of Gulf Tank/Dixie, he never discussed the allocation of this liability, Wyatt has since filed an affidavit in which he states that he now recalls that the agreement could not have been closed if Dixie had not agreed to indemnify Bay Tank against any liability associated with the Preyer litigation. Attached to this affidavit is a copy of an "Indemnity Agree-

2. On February 22, 1985, I entered an order granting Local 109's motion for summary judgment, and dismissed it as a defendant. The case went to trial only against Gulf Tank.

3. Bay Tank is a Florida corporation and was formed expressly for the purpose of acquiring Wyatt's and Dantzler's interests in the purchase agreement.

ment" specifically stating that the Preyer judgment remained Dixie's responsibility. *See* "Schedule C" attached to Wyatt's affidavit, doc. 45.[4] Thus, in the absence of anything further, the Indemnity Agreement sets out expressly that Dixie would remain liable for the *Preyer* judgment. However, as discussed *infra*, Bay Tank subsequently gave Dixie a complete and unlimited release, which appears to nullify the effect of the Indemnity Agreement.

Following the sale to Gulf Tank, Dixie filed a petition under Chapter 11 of the Bankruptcy Code on June 24, 1986. Although the Eleventh Circuit had affirmed the plaintiff's judgment in this case only three months earlier, it does not appear from the record that Dixie listed the *Preyer* judgment in its schedule of liabilities. In connection with its bankruptcy proceedings, Dixie made certain demands on Wyatt, individually, and on Bay Tank to pay certain debts. Wyatt and Bay Tank refused to pay, and Dixie subsequently filed two separate motions in the bankruptcy court seeking payment of these obligations. Wyatt and Bay Tank demanded a trial by jury and consequently the Bankruptcy Court referred both actions to the United States District Court for the Northern District of Alabama for trial. In June and August of 1988, the District Court concluded that the debts were valid and ordered payment.[5]

4. The Indemnity Agreement provides that

Seller [referring to Dixie] hereby agrees to save, defend, hold harmless and indemnify Purchaser [referring to Bay Tank] from and against the following claims, demands, causes of action and liabilities described below:

\* \* \* \* \* \*

4. Those liabilities referred to and set out on Schedule (7)(c), attached hereto. [Attachment to doc. 45]

In turn, Schedule (7)(c) provides at item (1) Wayne Preyer vs. Gulf Tank and Fabricating Co., Inc., United States District Court, Northern District of Florida, Panama City Division, MCA 83–2115—Case and attendant liability is to remain the responsibility of Dixie Steel & Supply Company, Inc. [Attachment to doc. 45]

5. On December 17, 1981, Wyatt executed a note in the principal amount of $13,500, with interest payable from that date at the rate of 12% per annum, to Gulf Tank. Dixie acquired this note in December 1982, when it purchased Gulf

Dixie, Bay Tank, and Wyatt later reached a settlement whereby Dixie agreed to compromise its claims against Wyatt and Bay Tank in exchange for payment of $138,000.00. As part of the agreement, Bay Tank executed a general release on February 15, 1989, which expressly releases Dixie from any and all claims arising not only from these two claims involved in the bankruptcy court litigation, but also from "any and every matter, thing, or event occurring or failing to occur at any time prior hereto with regard to any matter whatsoever."

Meanwhile, plaintiff Preyer, who had not had any contact from his attorney, Algia R. Cooper, since the Eleventh Circuit affirmed the judgment in his favor, filed a pro se petition with this court on August 26, 1986, requesting that a writ of execution be issued against Gulf Tank. Preyer appeared at the scheduled hearing on November 12, 1986, and noted that he had been unable to get in touch with his attorney. Because Preyer appeared without counsel, I deferred action on the merits of his motion. I noted, however, that Gulf Tank's sale to Dixie and the sale to Bay Tank, as well as Dixie's bankruptcy, left the identity of the true defendant unclear. Preyer contends that it was at this hearing that he first learned of these events.

On November 13, 1986, I entered an order directing Preyer's attorney, Algia R. Cooper,

Tank's assets. After filing its bankruptcy petition, Dixie made demand on Wyatt to pay the note, plus interest, by August 15, 1986. Wyatt failed to pay the note and Dixie subsequently filed a motion requesting an order requiring Wyatt to pay the debt. On June 13, 1988, the United States District Court for the Northern District of Alabama ordered Wyatt to pay the debt.

Dixie also filed a second, similar motion on its claim against Bay Tank. It appears that shortly after closing the purchase of Gulf Tank/Dixie, Bay Tank requested that Dixie perform three separate jobs for customers of Bay Tank. Dixie performed the jobs and Bay Tank admitted the indebtedness. However, it refused to pay for the work, alleging that it was entitled to offset the indebtedness against accounts receivable accruing from operations between the October 1, 1985, retroactive accounting date and the November 25, 1985, closing date. In a memorandum opinion dated August 12, 1988, the District Court rejected Bay Tank's argument, and entered an order requiring Bay Tank to pay the debt.

to show cause in writing why he failed to attend the November 12 hearing. Cooper failed to respond. I then learned that he was seriously ill. Attorney Cooper died on May 5, 1987.

Meanwhile, on May 4, 1987, Preyer had filed another pro se motion requesting a writ of execution against Gulf Tank, "D/B/A Bay Tank & Fabricating Co., Inc." In his motion, Preyer correctly explained that the assets of Gulf Tank had been transferred to Bay Tank while appeal of the judgment in his favor was pending before the Eleventh Circuit. He also submitted documentary evidence that he had obtained on his own from the Bankruptcy court showing that Dixie had not listed him as a creditor in its bankruptcy petition.

On May 6, 1987, I entered an order directing the Clerk to issue the requested writ. Preyer then sought the assistance of the U.S. Marshals Service in executing under the writ, but failed either to identify the property to be seized, or to provide an indemnity bond. The Marshals, therefore, were unable to execute upon any property under the writ.

Shortly thereafter, on September 15, 1987, Preyer filed a Proof of Claim in the Dixie bankruptcy. On November 6, 1987, Preyer filed an Amended Proof of Claim. These were dismissed. On March 16, 1988, Preyer filed his third pro se motion in this court, requesting a hearing to determine the identity of the proper defendant. This motion was denied, but Preyer was encouraged to retain an attorney to assist in executing his judgment.

Preyer subsequently retained his present attorney and initiated these proceedings against Bay Tank on January 29, 1990. Ultimately, on July 10, 1990, he filed his amended complaint in this action seeking to enforce his judgment. Now before the Court is Preyer's motion for partial summary judgment on the issue of Bay Tank's successor liability. In this motion, he argues that Bay Tank, as the successor, through Dixie, to the business of Gulf Tank, is liable to him for the judgment previously entered against Gulf Tank. In its cross-motion for summary judgment, Bay Tank counters that the imposition of successor liability is inappropriate in this

case. In the alternative, it argues that Preyer's successor liability claim is barred either by the applicable Florida statute of limitations, or by laches.

## II. ANALYSIS

### A. *Summary Judgment Standard*

A motion for summary judgment should be granted when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c) *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265, 273 (1986); *Everett v. Napper,* 833 F.2d 1507, 1510 (11th Cir.1987). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211 (1986). It is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the non-moving party. *Id. See also Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538, 552 (1986).

"The moving party is entitled to judgment as a matter of law if the nonmoving party cannot sufficiently show an essential element of the case to which the nonmoving party has the burden of proof." *Cornelius v. Town of Highland Lake,* 880 F.2d 348, 351 (11th Cir. 1989), *cert. denied,* 494 U.S. 1066, 110 S.Ct. 1784, 108 L.Ed.2d 785 (1990). However, summary judgment is improper "[i]f a reasonable fact finder could draw more than one inference from the facts, and that inference creates a genuine issue of material fact." *Id.*

On summary judgment motion, the record and all inferences that can be drawn from it, must be viewed in the light most favorable to the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176, 177 (1962). Furthermore, the court must consider the entire record in the case, not just those pieces of evidence which have been singled out for attention by the parties. *See Clinkscales v.*

*Chevron USA, Inc.*, 831 F.2d 1565, 1570 (11th Cir.1987).

## B. *Successor Liability*

 The general rule of successor corporate liability is that, when one corporation sells its assets to another, the latter is not responsible for the seller's debts or liabilities absent an express or implied agreement to assume specific obligations. *See Golden State Bottling Co. v. NLRB,* 414 U.S. 168, 182 n. 5, 94 S.Ct. 414, 424 n. 5, 38 L.Ed.2d 388, 402 n. 5 (1973). An exception to this rule is that a successor corporation may be held to answer for the unfair or discriminatory labor practices of its predecessor. *Howard Johnson Co. v. Hotel Employees,* 417 U.S. 249, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974); *Golden State Bottling Co. v. NLRB,* 414 U.S. 168, 94 S.Ct. 414, 38 L.Ed.2d 388 (1973); *NLRB v. Burns Int'l Sec. Serv., Inc.,* 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972); *John Wiley & Sons, Inc. v. Livingston,* 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964). The imposition of such liability on a successor corporation does not create new rights in the employee, but merely recognizes that the employee-victim of unfair labor practices is essentially helpless to protect existing rights when ownership of a business changes. *E.g., Golden State Bottling Co., supra,* 414 U.S. at 181–86, 94 S.Ct. at 423–26, 38 L.Ed.2d at 401–03; *In re National Airlines, Inc.* 700 F.2d 695, 698 (11th Cir.1983). In the context of the employee/employer relationship, the applicable courts have recognized that congressional policies against unfair and discriminatory labor practices embodied in statutes such as the National Labor Relations Act ("NLRA"), Title VII [42 U.S.C. § 2000e, *et seq.*], and Section 1981 override common law rules of successor liability. *Howard Johnson Co., supra,* 417 U.S. at 249, 94 S.Ct. at 2236, 41 L.Ed.2d at 46 (NLRA); *Golden State Bottling Co., supra,* 414 U.S. at 168, 94 S.Ct. at 414, 38 L.Ed.2d at 388 (NLRA); *Burns Int'l Sec. Serv., Inc., supra,* 406 U.S. at 272, 92 S.Ct. at 2571, 32 L.Ed.2d at 61 (NLRA); *John Wiley & Sons, Inc. v. Livingston,* 376 U.S. at 543, 84 S.Ct. at 909, 11 L.Ed.2d at 898 (NLRA); *Wheeler v. Snyder Buick, Inc.,* 794 F.2d 1228, 1236 (7th Cir. 1986) (Title VII); *Musikiwamba v. ESSI,*

*Inc.,* 760 F.2d 740, 745–46 (7th Cir.1985) (Section 1981); *In re National Airlines, supra,* 700 F.2d at 698 (Title VII); *Dominguez v. Hotel, Motel, Restaurant & Misc. Bartenders Union, Local 64,* 674 F.2d 732 (8th Cir.1982) (Title VII); *EEOC v. MacMillan Bloedel Containers, Inc.,* 503 F.2d 1086, 1093–94 (6th Cir.1974) (Title VII). There are, of course, logical reasons behind such conclusions. Unlike a third party's personal injury claim against a predecessor corporation, for example, an employee's claim for unpaid wages or benefits is internal and should not be extinguished because of a mere change in the corporation's external legal title.

 In applying the successor liability doctrine, a court must balance the public interest in the enforcement of congressionally established national labor policies against the public interest in maintaining and encouraging the free flow of capital as well as the limited liability principle of corporations. *Howard Johnson Co., supra,* 417 U.S. at 249, 94 S.Ct. at 2236, 41 L.Ed.2d at 46; *Golden State Bottling Co., supra,* 414 U.S. at 168, 94 S.Ct. at 414, 38 L.Ed.2d at 388; *Burns Int'l Sec. Serv., Inc., supra,* 406 U.S. at 272, 92 S.Ct. at 2571, 32 L.Ed.2d at 61; *Musikiwamba, supra,* 760 F.2d at 745–48; *In re National Airlines, supra,* 700 F.2d at 698. In striking this balance, the court must consider several factors.

 First, the court must consider whether the successor employer had prior notice of the claim against the predecessor. Second, the court must look at whether the predecessor is able, or was able prior to the purchase, to provide the relief requested. Finally, the court must determine whether there has been sufficient continuity in the business operations of the predecessor and the successor to justify imposition of liability. *Wheeler v. Snyder Buick, Inc.,* 794 F.2d 1228, 1236 (7th Cir.1986); *Musikiwamba, supra,* 760 F.2d at 750; *In re National Airlines, supra,* 700 F.2d at 698. This final factor is an amalgamation of a number of indicia of continuity identified in the various cases. These include such things as (1) whether the new employer uses the same

plant; (2) whether it uses the same or substantially the same work force; (3) whether it uses the same or substantially the same supervisory personnel; (4) whether the same jobs exist under substantially the same working conditions; (5) whether the successor uses the same machinery, equipment, and methods of production; and (6) whether he produces the same product. *See generally Musikiwamba, supra,* 760 F.2d at 750 (*citing EEOC v. MacMillan Bloedel Containers, Inc.,* 503 F.2d 1086, 1094 (6th Cir.1974)).

In this case, Preyer argues that, as the successor (through Dixie) to Gulf Tank's business, Bay Tank should be held liable for the judgment previously entered against Gulf Tank. Bay Tank counters that, because Dixie (its immediate predecessor) succeeded to Gulf Tank's business *before* Gulf Tank incurred the liability for the Preyer judgment, the chain of successor liability extending to it through Dixie does not include the judgment. Hence, the defendant maintains that even assuming that it is Dixie's "successor", Bay Tank cannot now be called upon to satisfy the judgment against Gulf Tank. This argument is without merit.

### (1) Dixie's Liability

First, it is clear that Dixie was liable for the judgment against Gulf Tank. Dixie, of course, expressly acknowledged that liability when it executed the Indemnity Agreement as part of the assets sale. Standing alone, that agreement bridges any gap with regard to Dixie's liability in the chain of successor entities. Moreover, applying the three-part test for successor liability to the undisputed facts in this case leads to the inescapable conclusion that Dixie was liable for the *Preyer* judgment under traditional successor liability theory. Finally, the undisputed facts leave no doubt that the judgment should be equitably corrected to properly reflect Dixie's direct liability.

Even though judgment was entered against Gulf Tank & Fabricating Co., Inc., it is now obvious that Dixie Steel & Supply Co., Inc. should have been the defendant in this case. The events giving rise to Preyer's Section 1981 claim occurred well *after* the sale of Gulf Tank's assets to Dixie, and it was Gulf Tank/Dixie, not Gulf Tank, that fired him. This was known to Gulf Tank, Wyatt, and Dixie. Yet, they never brought it to the court's attention. Instead, they further confused matters by maintaining that Gulf Tank was being operated as a "subsidiary" of Dixie.

It is now undisputed that Gulf Tank was never a subsidiary of Dixie. Even though it did not engage in any business activity after the transfer of its operating assets to Dixie in 1982, Gulf Tank continued to exist as a viable corporate entity under the laws of Florida. At the time of the trial in this matter, it was essentially only a shell, but it did have assets—notably the note from the sale of its operating assets to Dixie. It is clear, however, that Preyer intended to sue the entity that was his employer, and that had terminated his employment in 1983. That entity was Dixie, not Gulf Tank.

Gulf Tank, Dixie, and the principals of Bay Tank continued their obfuscatory conduct. Dixie sold its Gulf Tank Division to Wyatt and Dantzler, via Bay Tank, while the judgment was still on appeal, but failed to notify either this court or Preyer. Later, Dixie failed to list the *Preyer* judgment in its bankruptcy petition as a liability, even though it had expressly agreed to retain responsibility for it. Though I noted as early as November 1986 that the sale of assets and subsequent bankruptcy left the identity of the true defendant in this case unclear, neither Gulf Tank, Dixie, nor Bay Tank ever attempted to clarify matters. To this day, neither Gulf Tank, Dixie, Bay Tank, nor any of the individual principals involved in all three corporations, has offered an explanation for their conduct.

Despite the fact that Gulf Tank was named in the complaint, it appears that Dixie, in fact, defended this case. Wyatt, who not only was Dixie's registered agent in the state of Florida, but also Gulf Tank/Dixie's General Manager, acted as corporate representative during the litigation. In this capacity, he responded to discovery requests, gave deposition testimony concerning the operation of Gulf Tank/Dixie, and testified at trial.

Bay Tank attempts to argue that Wyatt was acting as a representative of Gulf Tank, not Dixie. However, none of the evidence presented at trial had anything to do with the operation of Gulf Tank, which, at the time, carried on no business. Rather, *all* the evidence at trial related to the discriminatory conduct of Preyer's employers at Gulf Tank/Dixie's (i.e. Dixie's) Panama City plant. Finally, I note that Wyatt, who is now part owner and general manager of Bay Tank, has been personally involved in every aspect of this case, yet has made no effort to rectify the misperceptions that he helped create.

Under these facts, I can conclude only that the conduct of Gulf Tank, Dixie, and Bay Tank (as well as the individual principals involved throughout) has been intentionally misleading. "Unclean hands" are surely present. The undisputed facts require that the original judgment be reformed to impose the liability upon Dixie, which it has previously acknowledged in writing and is estopped from now denying.

### 2. Knowledge of Bay Tank

Having recognized Dixie's liability for the *Preyer* judgment, it is undisputed that, through Wyatt, Bay Tank had knowledge of both Preyer's judgment against Gulf Tank, and Dixie's liability for it. Wyatt not only served as General Manager of Gulf Tank/Dixie, but also served as Dixie's representative during the litigation in this case. Wyatt obviously recognized the potential liability flowing from this litigation, and has specifically acknowledged that the 1985 agreement to purchase Gulf Tank/Dixie could not have been closed if Dixie had not agreed to indemnify Bay Tank against any liability associated with the *Preyer* judgment. Presumably, all other Bay Tank principals with prior association in the Gulf Tank/Dixie operation had similar knowledge.

Bay Tank later, in 1989, executed a general release of Dixie from any and all liabilities arising from any source whatsoever. In the absence of this release, liability would have remained with Dixie under the written Indemnity Agreement. Bay Tank now argues that it would not have executed the 1989 release if it had known that it might thereby become liable for the *Preyer* judgment. This argument simply is not plausible. Assuming that the release was effective, it is indisputable that Bay Tank (through Wyatt and others) knew of the judgment. Having specifically provided for the allocation of this judgment in the original agreement for the sale of Gulf Tank/Dixie's assets, Bay Tank cannot claim that it was completely unaware that the 1989 release might shift responsibility for this liability. To the contrary, it had all the information necessary to make an informed decision regarding the release. Its knowledge notwithstanding, Bay Tank agreed to the broadest possible release terms. All the undisputed evidence refutes Bay Tank's claim that it "didn't know."

### 3. Dixie's Ability to Provide Relief

The second factor—whether Dixie is able, or was able prior to the purchase, to provide the relief requested—presents a more complicated question. The main rational underlying the imposition of successor liability is that an employee's statutory rights should not be vitiated by the mere sudden change in ownership of the employer's business. *See, e.g., Golden State Bottling Co. v. NLRB, supra,* 414 U.S. at 181, 94 S.Ct. at 423, 38 L.Ed.2d at 401. The employee should be able to enforce against the successor a judgment that he could have enforced successfully against a predecessor. *Id.* Absent extraordinary circumstances, an injured employee should not be made worse off by a change in ownership. *Id.; Musikiwamba, supra,* 760 F.2d at 750.

The corollary, of course, is that neither should an injured employee be made better off. The Supreme Court has made it clear that the public has a substantial interest in the free transfer of capital and the reorganization of unprofitable businesses. *NLRB v. Burns Security Serv., Inc.,* 406 U.S. 272, 281–91, 92 S.Ct. 1571, 1579–84, 32 L.Ed.2d 61, 68–75 (1972). Imposing liability on a successor when a predecessor could have provided no relief whatsoever likely would inhibit the reorganization and transfer of assets of failing businesses.

From the record in this case, it is apparent that, before the Dixie's sale to Bay Tank,

Dixie was under financial pressure. It is also apparent that the sale of assets to Bay Tank was an attempt to relieve some of that pressure. However, the mere fact that Dixie was experiencing financial difficulties does not prove that Preyer had no reasonable chance of recovery. Similarly, the fact that Dixie sought bankruptcy protection seven months after the sale does not prove that Dixie could not have satisfied Preyer's judgment before or at the time of the sale.

As part of the purchase price for Gulf Tank/Dixie, Bay Tank agreed to assume $350,000 of Dixie's trade accounts payable, and paid $330,000 on a loan Dixie had from Barclay's American Bank. In addition to the sale of its Gulf Tank Division, Dixie sold or restructured several other corporate assets. Nevertheless, it is contended that for the fiscal year ending August 31, 1985, Dixie "lost" $194,000.

It is not clear what defendant Bay Tank means by the term "lost", and there is no financial information in the record relating to this period. The record does reflect such information for the period that followed. A "statement of income and retained earnings for the interim period September 1, 1985 to March 31, 1986," shows a "net loss to retained earnings" of $748,248. This entire "loss" is attributable to a "net loss from sales of business segments" of $962,581. The financial information in the record does not indicate how this amount was derived. Nor does it indicate which "business segments" were sold, or how. Net income before this "loss" is listed at $214,333. In addition, an unaudited balance sheet prepared shortly after the sale to Bay Tank reveals stockholders equity in the amount of $2,777,857.

Preyer's judgment was relatively small, and the evidence is undisputed that, before the sale to Bay Tank, Dixie had sufficient assets against which Preyer could have executed under his judgment. Conversely, Bay Tank has failed to show that Dixie could have provided "no relief whatsoever" before the sale. Perhaps the simple answer to this inquiry is to note that Dixie received $138,000 in settlement of its claims against Wyatt and Bay Tank. That amount, alone, is enough to satisfy the *Preyer* judgment.

Finally, a court must be mindful of the fact that "[i]t would be grossly unfair ... to impose successor liability on an innocent purchaser when the predecessor is fully capable of providing relief...." *Musikiwamba, supra,* 760 F.2d at 750. As discussed above, Dixie filed a petition under Chapter 11 of the Bankruptcy code on June 24, 1986. It is true that Dixie did not list Preyer among its creditors, and that, as a result, the judgment has not been discharged. Nevertheless, Preyer is still subject to the automatic bankruptcy stay and the other creditor limitations in bankruptcy. In order to collect his judgment, therefore, Preyer would have to petition the Bankruptcy Court for relief. Preyer, in fact, has attempted to file two proofs of claim with the Bankruptcy Court. However, he has been totally unsuccessful in attempting to get any relief via the bankruptcy proceedings. More importantly, Dixie's contractual obligation for the *Preyer* judgment has now been released by Bay Tank, so that it would be futile to pursue it further. Accordingly, I conclude from the record that Dixie is presently incapable of satisfying Preyer's judgment.

### 4. Continuity

Looking at the final factor, i.e., whether there is a sufficient degree of continuity in the business operations of the predecessor and successor corporations, there can be no question that Bay Tank continued in almost exactly the same business as Gulf Tank/Dixie. It is undisputed that Bay Tank operated out of the same plant, utilized substantially the same equipment, manufactured the same products and used the same employees and supervisory personnel as Gulf Tank/Dixie. Bay Tank argues, however, that because it did not purchase *all* of Dixie's assets, the continuity of business operations is insufficient to impose successor liability.

Bay Tank's position is erroneous. "Successorship has been found where the new employer purchases a part or all of the assets of the predecessor employer." *Golden State Bottling Co., Inc. v. NLRB,* 414 U.S. 168, 182 n. 5, 94 S.Ct. 414, 424 n. 5, 38 L.Ed.2d 388, 402 n. 5 (1973). It is undisputed that Wyatt and Dantzler purchased Gulf Tank Dixie as a

"going concern", and that Bay Tank now operates a nearly identical business. Under the undisputed material facts of this case, I can reach no conclusion other than that there is sufficient continuity of business operations between Dixie and Bay Tank to justify the imposition of successor liability on Bay Tank.

## C. *Statute Of Limitations And Laches*

### 1. Statute of Limitations

■ Bay Tank also has moved for summary judgment on the grounds that Preyer's successor liability claim is barred by the Florida statute of limitations applicable to Section 1981 claims. In the alternative, it argues that Preyer's claim is barred by the Florida Statute of limitations applicable to "actions on a judgment". Bay Tank has cited to no federal statute of limitations on point. Since I conclude that neither of the Florida statutes preclude Preyer's claim, Bay Tank's cross-motion for summary judgment must be DENIED insofar as it is based on Florida's statutes of limitations.

■ According to Bay Tank, the limitations period for Section 1981 claims also applies to Preyer's successor liability claim. Since Section 1981 contains no statute of limitations, the federal courts are required to apply the most analogous state statute of limitations. *Goodman v. Lukens Steel Co., Inc.*, 482 U.S. 656, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987). Following the Supreme Court's lead, the Eleventh Circuit has determined that Section 1981 claims are most analogous to personal injury claims, and therefore, are governed by Florida's four year statute of limitations set out at Section 95.11(3), *Florida Statutes* (1991). *See Baker v. Western Indus., Inc.*, 850 F.2d 1480 (11th Cir.1988).

It is obvious that Preyer's successor liability claim is not a claim under Section 1981. That claim was reduced to judgment in 1985. Rather, Preyer's present claim is an action to enforce that judgment. The only issue is whether Bay Tank is liable for the judgment previously entered against Gulf Tank.

In the alternative, Bay Tank suggests that, at the very least, Preyer's claim is subject to Florida's five year statute of limitations applicable to "actions on a judgment". *See*

§ 95.11(2), *Fla.Stat.* (1991). Again, I disagree.

Bay Tank cites to no authority in support of its contention that Section 95.11(2) applies to this case. However, I note that Rule 69(a), Federal Rules of Civil Procedure, seems to make the state's practice and procedure applicable to actions on a federal judgment, in the absence of federal statutes to the contrary.

Assuming, without deciding, that Section 95.11(2) is applicable to Preyer's claim, defendant's argument still must fail. Preyer filed his original motion in this court on January 29, 1990. Even assuming, as defendants suggest, that the five year period began to run on the date of the judgment, i.e. February 25, 1985, Preyer's motion falls within the five-year limitations period. If, as is more likely, the limitations period began to run only after the appeal was concluded and the judgment became final, then this action is well within the limitations period. In any event, it does not bar this action.

### 2. Laches

■ In the alternative, Bay Tank argues that, if Preyer's successor liability claim is not barred by the statute of limitations, it is barred by laches. Again, I disagree. "To apply laches in a particular case, the court must find both that the plaintiff delayed inexcusably in bringing the suit, and that this delay unduly prejudiced defendants." *Bernard v. Gulf Oil Co.*, 596 F.2d 1249, 1256 (5th Cir.1979) (citations omitted). In this case, the record plainly reveals that Preyer has diligently sought to enforce his judgment from the moment the Eleventh Circuit affirmed his judgment. It is not necessary to again recite the efforts made by Preyer, for they are set out in the preceding portions of this order.

I do not know what efforts Preyer made to retain counsel during the ten months that intervened between my July 1989 order and the filing of the notice of appearance. However, I will take judicial notice of the fact that Preyer's judgment is relatively small, and, as the length of this order denying the parties various motions for summary judg-

ment might indicate, the issues involved are complex and require a great deal of research. Most attorneys would be reluctant to take such a case. Accordingly, I do not consider a 10–months delay in retaining counsel to be "inexcusable".

In sum, the factual and legal complexities of this case might well cause difficulties for an experienced attorney. In light of this fact, I can conclude only that Preyer acted with due diligence in attempting to execute upon his judgment. Any prejudice Bay Tank may have suffered as a result of Preyer's delay in seeking to supplement his complaint is traceable, at least in part, to Wyatt's, Bay Tank's, and Dixie's conduct during and after the original litigation of this case. Accordingly, Bay Tank's motion for summary judgment is DENIED insofar as it is based on laches.

## III. CONCLUSION

For the reasons set out above, Plaintiff's motion for partial summary judgment is GRANTED, and defendants' cross-motion for summary judgment is DENIED. The Clerk shall enter a partial summary judgment (on the issue of liability only) in favor of plaintiff Preyer and against defendant Bay Tank & Fabricating Co., Inc.

DONE AND ORDERED.