In re **FAIRCHILD AIRCRAFT CORPORATION, Debtor.**

**FAIRCHILD AIRCRAFT INCORPORATED,**
Plaintiff,

v.

Barbara M. **CAMBELL, Individually and as Administratrix of the Estate of Charles E. Cambell, Deceased, Yvonne C. Brooks, Individually and as Administratrix of the Estate of Markvan B. Brooks, Deceased, and R.H. Brooks, In-**

dividually, Insurance Company of North America, Eastern Foods, Inc., Hooters of America, Inc., Joan W. Duncan, Individually and as Personal Representative of the Estate of G. Dan Duncan, Defendants.

Bankruptcy No. 90–50257.
Adv. No. 94–5113.

United States Bankruptcy Court,
W.D. Texas,
San Antonio Division.

July 6, 1995.

James A. Hoffman, Clemens and Spencer, San Antonio, TX, Donald R. Anderson, Dennis M. Hill, Phillip G. Pampillo, Drew Eckel & Farnham, Atlanta, GA, for defendants Ins. Co. of North America, Eastern Foods, Inc. and Hooters of America, Inc.

John A. Hagins, Covington, Patrick, Hagins & Lewis, Greenville, SC, for defendant Joan W. Duncan.

Andrew M. Scherffius, Atlanta, GA, for defendant Barbara M. Cambell.

David William Boone, Atlanta, GA, for defendant Yvonne C. Brooks.

Deborah D. Williams, Cox & Smith, Inc., San Antonio, TX, Mark T. MacNamec, Thomas Dundon, Neal & Harwell, Nashville, TN, Geoffrey C. Hazard, Jr., Elizabeth Warren, University of Pennsylvania Law School, Philadelphia, PA, for plaintiff Fairchild Aircraft Corp.

## AMENDED * MEMORANDUM DECISION ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

LEIF M. CLARK, Bankruptcy Judge.

CAME ON for consideration the foregoing matter. Fairchild Aircraft Incorporated

* Modified to correct a technical error only.

("FAI") filed its Complaint for Declaratory and Injunctive Relief in the bankruptcy case of Fairchild Aircraft Corporation ("FAC"). Defendants moved for dismissal for lack of subject matter jurisdiction and failure to state a cause of action. FED.R.CIV.P. 12(b)(2), (6). After denying these motions, both parties moved for summary judgment. After hearing, the court took the matter under submission. This decision now resolves the cross-motions for summary judgment and decides the adversary proceeding.

The issue of future claims in bankruptcy has bedeviled the federal courts for many years now. What happens after a bankruptcy plan disposes of all the assets of a debtor and, years later, someone suffers an injury alleged to have arisen from a defective product produced by the prepetition debtor? Does the injured party have a claim against the successor entity for damages, unaffected by the bankruptcy process? Or may bankruptcy alter or even eliminate those claims before they even mature into an injury? That is the issue with which this decision struggles and attempts to resolve.

### Background Facts

The facts surrounding this matter span over a decade, beginning sometime before 1985 and ending with the filing of this adversary proceeding in August 1994. As they relate to the resolution of the present controversy, the facts are undisputed.

Fairchild Aircraft Corporation manufactured and sold commuter aircraft, one a 19–seat passenger aircraft sold to civilians as a Metro III and to the military as the C–26, and the other a smaller aircraft sold as the Merlin II and III or the Fairchild 300. This case concerns the crash of one these smaller aircraft, a Fairchild 300. FAC stopped production of the Fairchild 300 in 1982. FAC continued to sell the aircraft as late as 1985, because it held several of the airframes in inventory. It is undisputed that the aircraft in question in this case was manufactured no later than 1982 and sold no later than 1985—five years before FAC's later chapter 11 bankruptcy.

FAC filed for chapter 11 relief on February 11, 1990. Shortly after the filing, a chapter 11 trustee was appointed (the "Trustee"), with full authority to operate the debtor's business. The Trustee, Bettina M. Whyte, decided that reorganization was not a viable option for the estate, and solicited a buyer for the company's assets, which she proposed to sell as a going concern. On August 14, 1990, the Trustee entered into an asset purchase agreement with a group of investors who formed a corporation for the purpose of the acquisition, called appropriately enough Fairchild Acquisition, Inc. FAI was to pay $5 million in cash and was to assume liability for FAC's secured debt to Sanwa Business Credit, in the range of $36 million. The estate was to retain some cash, its estate causes of action (including preference actions), and a share of an anticipated tax refund. The asset purchase agreement also contained the following provision, which the acquiring entity maintains was an essential element of the bargain and induced the seller to purchase the assets for as much as it did:

> Purchaser shall not assume, have any liability for, or in any manner be responsible for any liabilities or obligations of any nature of Seller or the Trustee, including without limiting the generality of the foregoing: ... (ii) any occurrence or event at any time which results or is alleged to have resulted in injury or death to any person or damage to or destruction of property (including loss of use) or any other damage (regardless of when such injury, death or damage takes place) which was caused by or allegedly caused by (A) any hazard or alleged hazard or defect or alleged defect in manufacture, design, materials or workmanship ...

The sale took place as part of the confirmation of the Trustee's First Amended Plan of Reorganization and was of course subject to the approval of the bankruptcy court. *See* 11 U.S.C. § 1123(b)(4). On September 17, 1990, the court confirmed the Trustee's Plan and the asset sale agreement which was its central feature. The confirmation order expressly stated that the assets were sold "free and clear of all liens, claims, and encumbrances," except for those liens and encumbrances assumed by the buyer under the plan. *See* 11 U.S.C. § 1141(c). The order further stated that the purchaser would not "assume, have any liability for, or in any manner be responsible for any liabilities or obligations of any nature of Debtor, Reorganized Debtor, the Trustee or the Fiscal Agent." Finally, the order enjoined and stayed "all creditors, claimants against, and persons claiming or having any interest of any nature whatsoever" from "pursuing or attempting to pursue, or commencing any suits or proceedings at law, in equity or otherwise, against the property of the Debtor's estate ... the proceeds of the sale ... or any other person or persons claiming, directly or indirectly, including the Purchaser under the Asset Purchase Agreement ..."

The court found that the consideration to be paid by FAI (the cash and the assumption of secured debt) was "fair and adequate and fully representative of the maximum value that can be realized at this time for Debtor's Property." The court also made a finding that the notice provided concerning the plan and disclosure statement was reasonable under the circumstances. The Trustee had published notice of the disclosure statement, plan of reorganization and confirmation hearing in the *Weekly News of Business Aviation,* and in two local newspapers, the *San Antonio Light* and the *San Antonio Express–News.*

The Trustee made no provision in her plan for claimants in the position of these defendants. Indeed, the debtor had not even listed any of the owners or operators of FAC aircraft in its bankruptcy schedules, though their identities were available and ascertainable from the records of FAC.[1] The Trustee made no particular effort to reach these persons in the plan process, and the plan itself made no particular provision for these persons.

---

1. One of the defendants in this case had purchased the aircraft in question prepetition, and his identity was known to the company. Of course, as of the filing, the aircraft had not crashed.

On April 1, 1993, a Fairchild 300 aircraft, originally sold and manufactured by FAC crashed near Blountville, Tennessee. Four individuals lost their lives. Multiple lawsuits were of course filed on the heels of this crash, in both federal and state courts in Georgia, Tennessee and South Carolina. Three of the plaintiffs were persons suing both individually and on behalf of estates of the individuals killed in the aircraft crash. The plaintiffs also included Eastern Foods, Inc. and Hooters of America, Inc., the owners of the airplane, as well as Insurance Company of North America, the owner's insurance carrier. The plaintiffs named FAI as one of the defendants, alleging that the aircraft was defectively manufactured by FAC, and that FAI is now liable for the manufacture and sale of a defective product on a successor liability theory.[2] FAI filed this adversary proceeding as a preemptive strike, seeking an order for declaratory and injunctive relief premised on the provisions of the plan, the asset purchase agreement, and the court's order confirming the plan. As such, the plaintiffs in the products liability lawsuits find themselves as defendants in this action for declaratory relief.

## Discussion

### I. *Framing the Issue*

The legal issues presented can be stated simply. FAI claims that the provisions of the asset purchase agreement and order confirming the plan "cleansed" the property acquired of any liability for the acts of FAC, including any successor liability growing out of the sale of those assets to FAI by the trustee of FAC's bankruptcy. FAI says that the sale was free and clear of this sort of liability, and that the bankruptcy court should here so declare. FAI also contends that any lawsuit to force liability on FAI based upon its acquisition of assets would violate the bankruptcy court's injunction contained in the confirmation order, and asks the court to enforce that injunction.

FAI would like to stop the defendants in their tracks without ever having to defend against a successor liability lawsuit. It is not hard to understand why. Even if FAI believes the successor liability allegation to have little merit (and that is its position), it must still incur the cost of defense and risk the uncertainty of litigation. Moreover, there are still other FAC aircraft out there, and if another one crashes, an adverse outcome in this litigation could all but assure an adverse outcome in other litigation as well. Rather than endure these risks, FAI would like to rely on what it believes to have been the effective protections built into the court-supervised sale process, protections for which it believes it bargained. If those protections prove to be worthless, then it will not have received the benefit of its bargain, a result with consequences reaching far beyond this litigation not only for FAI but also for bankruptcy estates in general.

FAI first argues that, because the assets were sold under the plan "free and clear of all liens, claims and encumbrances," and of "interests in such property," the assets must have, *ipso facto*, also been sold free of any successor liability. Defendants counter that the self-same asset purchase gave rise to the successor liability of FAI. Alternatively, FAI argues that the court had the authority to enter an injunction to cut off suits such as this, incident to its powers under sections 1123 and 105 of the Code.

### II. *Subject Matter Jurisdiction*

■ At the outset, we must address the challenge to the court's subject matter jurisdiction to even entertain this dispute. That challenge is premised on two important circuit court decisions, which suggest that a bankruptcy court cannot enjoin successor liability lawsuits arising out of injuries which occurred post-confirmation. *Zerand–Bernal Group, Inc. v. Cox*, 23 F.3d 159, 161–63 (7th Cir.1994); *Mooney Aircraft Corp. v. Foster (Matter of Mooney Aircraft)*, 730 F.2d 367, 372–75 (5th Cir.1984). According to *Cox*,

---

**2.** While not relevant to the present matter, defendant's successor liability claims are not the only ones made against FAI. The defendants further allege claims based upon independent conduct by FAI after the purchase of the assets from FAC and prior to the crash. These claims are primarily based upon the alleged failure of FAI to warn or instruct users of defects and hazards associated with the operation of a Fairchild aircraft.

bankruptcy jurisdiction cannot extend to claims which come into existence after the bankruptcy and certainly cannot extend to protect a third party (the successor).

■ Certainly, the Seventh Circuit is right in its conclusion that section 1334(b), while a reservoir of jurisdiction, is not a bottomless well. Bankruptcy has an ending as well as a beginning, and after it is all over, so also is the federal court's role in the ongoing life of the debtor entity post-bankruptcy. But section 1334(b) is not the only source for a federal court's exercise of jurisdiction in a bankruptcy-related matter. All-encompassing (and by extrapolation, all delimiting) as that section is, it does not supplant other bases for a federal court's involvement having a much older lineage.

■ For example, all federal courts have the jurisdiction to enforce their own orders. *Local Loan Co. v. Hunt*, 292 U.S. 234, 239, 54 S.Ct. 695, 697, 78 L.Ed. 1230 (1934); *Royal Insurance Company of America v. Quinn–L Capital Corporation*, 3 F.3d 877, 881 (5th Cir.1993); *Lee v. Hunt*, 631 F.2d 1171 (5th Cir.1980), *cert. denied*, 454 U.S. 834, 102 S.Ct. 133, 70 L.Ed.2d 112 (1981); *Paris*, 132 B.R. at 508; *In re White Motor Credit Corp.*, 75 B.R. 944, 947 (Bankr. N.D.Ohio 1987). This jurisdiction includes the power to declare and determine the scope and effect of an order entered in prior bankruptcy proceedings, and the ability to rule on the legality of plan provisions, and releases and injunctions which may be part of the plan. *Public Service Co. of New Hampshire v. Richards (In re Public Service Co. of New Hampshire)*, 148 B.R. 702, 705 (Bankr.D.N.H.1992); *Matter of Specialty Equipment Companies, Inc.*, 3 F.3d 1043, 1045 (5th Cir.1993). That is essentially what FAI is asking the court to do in this case—to declare and enforce a prior order of this

court. Nothing in section 1334 even vaguely suggests a congressional intent to carve out any sort of "bankruptcy exception" to the time-honored doctrine announced in *Local Loan.*[3]

Both *Cox* and *Mooney* recognized that courts have jurisdiction to enforce their own orders, but noted that this ancillary jurisdiction is itself limited by the jurisdictional limits of the order sought to be enforced. *Cox*, 23 F.3d at 163; *Mooney*, 730 F.2d at 374–75. The subject matter of the injunctive relief sought in the current proceeding must be "encompassed in the court's prior order." *Id.; see also Royal*, 3 F.3d at 881 (a court may not use the *ancillary proceedings* doctrine to enforce an order which it did not make). No doubt *Cox* is correct on this point. Before any court can decide whether enforcement of a given order is appropriate, it must first explore the prior order to determine its scope and effect. *See Specialty Equip.*, 3 F.3d at 1043; *Public Service Co.*, 148 B.R. at 708. Implicit in that process is the need to determine whether the prior order was one properly within the subject matter of the jurisdiction of the court to enter. Both *Cox* and *Mooney* at least implicitly recognized this when they held that the prior orders sought to be enforced there could not, as a matter of subject matter jurisdiction, encompass the claims sought to be affected by the enforcement action. *Cox*, 23 F.3d at 163; *Mooney*, 730 F.2d at 375.

■ Precisely the same issue is presented here. In order to rule with finality whether this court has the requisite ancillary jurisdiction to enforce the prior orders of this court regarding the sale of assets to FAI, the court must make the subsidiary finding that the prior orders themselves fell within the court's subject matter jurisdiction. The

3. This is not a question of whether the *bankruptcy* court has the "power" to decide this issue. Subject matter jurisdiction asks whether a given dispute can even be considered by a federal court—*any* federal court. We are not asked here to decide whether the "right" federal judge is ruling on this question, nor do we need to. The nature of the action, being one to interpret an order entered in a core proceeding, is itself core. As such, it is properly presented to this court for adjudication. But even were it not, the parties

have had their remedies from the beginning. They could have sought withdrawal of the reference and requested a district court to rule on the issue. This court, as an adjunct of the district court, is doing no more than exercising the subject matter jurisdiction conferred on the district court. *See Matter of Clay*, 35 F.3d 190 (5th Cir.1994). Thus, the answer to the *subject matter jurisdiction* question will be the same regardless before which tribunal the matter is pending.

court may proceed with that task because a court always has the jurisdiction to determine its own jurisdiction. *Moran v. Kingdom of Saudi Arabia*, 27 F.3d 169, 172 (5th Cir.1994); *Gilchrist v. Westcott (Matter of Gilchrist)*, 891 F.2d 559, 561 (5th Cir.1990); *In re Sax*, 796 F.2d 994, 998 (7th Cir.1986).

The process of evaluating the injunctive orders contained in the order of confirmation and sale has two parts. First, we must ask whether, under the powers granted under the Bankruptcy Code, the court's prior order *could have* encompassed, and thereby affected, the defendants' lawsuits. Second, we must know whether the court's prior order *did in fact* encompass and affect the Defendants' lawsuits.

Turning to the first question (which, if answered in the negative, would be dispositive of the case), we note that there are two possible bases for the notion that the orders in question *could have* affected the defendants' lawsuits. One is that, via the confirmation of the trustee's plan, the debtor's assets were sold "free and clear of all liens, claims and encumbrances," invoking the extraordinary cleansing powers of section 363(f). *See* 11 U.S.C. § 363(f). All parties of course agree that the asset purchase agreement, and the order of confirmation which approved that agreement, *purport* to achieve precisely this result. But does the statute in fact permit sales free and clear of the sorts of interests held by the defendants in this case? If it does not, then the court's order exceeds the authority conferred by the statute, and cannot be enforced in this ancillary proceeding.[4] The other is that, the liabilities associated with the defendant's injuries may have been bankruptcy claims. If this were the case, then these liabilities would have been discharged under section 1141(d). *See* 11 U.S.C. § 1141(d). Arguably, at least at this time, the discharge of these liabilities as

against the predecessor-debtor would leave nothing for the successor to assume.

### III. Sale Free and Clear

For the proposition that the assets were property sold free and clear, FAI relies upon two arguments to supports its position. First, FAI points to the broad language of the section, emphasizing the term *"any interest."* FAI says that this language means that a sale free and clear must insulate the buyer from the claims of any person whose claim could be said to be assertable against the property, and one such claim is the trailing liability that gives rise to the successor liability being asserted here against FAI. FAI cites several decisions in support of this contention. *See In re Paris Industries Corp.*, 132 B.R. 504, 508 (D.Maine 1991); *In re White Motor Credit Corp.*, 75 B.R. 944, 947 (Bankr.N.D.Ohio 1987); *In re All American of Ashburn, Inc.*, 56 B.R. 186, 189–90 (Bankr.N.D.Ga.1986). Secondly, FAI argues that its interpretation is consistent with the broader policy of maximizing value for estate assets and encouraging reorganization.

FAI's argument, however, does not square with the plain language of the statute. *Patterson v. Shumate*, 504 U.S. 753, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1993); *United States v. Ron Pair Enter., Inc.*, 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989). FAI is entirely correct that the phrase *any interest* suggests that it be interpreted broadly, and could conceivably be interpreted to embrace "trailing" tort liability. But the phrase cannot be read in isolation. *Dewsnup v. Timm*, 502 U.S. 410, 420, 112 S.Ct. 773, 779, 116 L.Ed.2d 903 (1992) (Scalia, J., dissenting). Section 363(f) does not authorize sales free and clear of *any interest*, but rather of *any interest in such property*. These three additional words define the real breadth of *any interests*. The sorts of interests impact-

---

4. It is important to note here that we are not presented with a *Shoaf* situation. *See [Shoaf* cite]. The defendants who are here before the court could not, by any stretch of the imagination, be held to be barred under principles of *res judicata* from resisting the force of the court's prior injunction. They were not (for the most part) even there, and could not have been. Except for the purchasers of the aircraft (who

might conceivably have been prepetition claimants in the more traditional sense and who might have had actual notice of the bankruptcy case), the defendants are all persons who had no way of knowing in 1990, when this plan was confirmed and these assets were sold, that they would ever be claimants against the bankruptcy estate. *Shoaf* simply does not apply.

ed by a sale "free and clear" are *in rem* interests which have attached to the property. Section 363(f) is not intended to extinguish *in personam* liabilities. Were we to allow "any interests" to sweep up *in personam* claims as well, we would render the words "in such property" a nullity. No one can seriously argue that *in personam* claims have, of themselves, an *interest in such property.*

One could plausibly argue that, in bankruptcy at least, entities with otherwise purely *in personam* claims against a prepetition debtor might, via the bankruptcy filing, acquire an "interest" in the bankruptcy estate (which consists essentially of the debtor's assets). This interest in the estate's assets might be thought of as *in rem,* bringing the unsecured creditor's claim within the sweep of section 363(f), and providing an important linchpin for the "discharge of future claims" argument urged here by FAI.

But the argument will not withstand scrutiny. For one, the argument unnecessarily (and perhaps impermissibly) blurs the distinction between secured and unsecured creditors' interests in the estate. Even though all creditors have an interest in the estate, they do not have the *interest in property* that would be cognizable under 506(a) for example. Otherwise, the distinctions drawn there between secured and unsecured claims would be all but obliterated. Moreover, we know (or should know) that unsecured creditors of an estate do not have the right to "credit bid" their claim at the sale. 11 U.S.C. § 363(k); *see In re Moritz,* 162 B.R. 618, 619 (Bankr.M.D.Fla.1994) (unsecured creditors are not entitled to bid in all or part of their claims). And if unsecured creditors had an "interest in property" sufficiently cognizable that a special provision is required to achieve a sale "free and clear," then those selfsame creditors should also be entitled to adequate protection of those inter-

ests during the pendency of the case. But that notion too essentially renders the distinctions drawn in the Code a nullity. 11 U.S.C. § 362(e); *see also* 11 U.S.C. § 362(d)(1) (providing for relief from the automatic stay for cause, including "lack of adequate protection of an interest in property of such party in interest"). We must respect the argument for its ingenuity, but reject it as inconsistent with the plain language of the statute.[5]

■ To be sure, as a matter of policy, perhaps bankruptcy courts *should* have the power to sell property "with no strings attached," both because it would encourage buyers to pay more for estate assets, to the benefit of the process's intended beneficiaries, the creditors, and because it encourages equality of distribution. Purchasers are certainly more likely to pay more for assets with no trailing liability, and will likely discount the price they will pay to account for the possibility of having to absorb trailing liabilities. And allowing a post-bankruptcy claimant whose claim arose from the debtor's prepetition conduct to follow property into the hands of a purchaser skews the bankruptcy distribution scheme, permitting that creditor to receive what amounts to a priority of payment over claimants whose injury happens to have manifested itself before plan confirmation. Goes the argument, the same conduct gave rise to both claims. Only serendipity explains why one claimant is bound by the plan, while the other is permitted to pursue full recovery, based only upon the timing of the injury, and serendipity seems a poor decisional point for such a major policy choice.

■ Other courts have appreciated these concerns as well. *See Zerand–Bernal Group, Inc. v. Cox,* 23 F.3d 159 (7th Cir. 1994); *Matter of UNR Industries, Inc.,* 20 F.3d 766, 769–70 (7th Cir.1994); *Forde v. Kee–Lox Manufacturing Company, Inc.,* 437

---

5. The majority of cases interpreting section 363(f) share our view. *In re Wolverine Radio Co.,* 930 F.2d 1132, 1147 (6th Cir.1991), *cert. dismissed,* 503 U.S. 978, 112 S.Ct. 1605, 118 L.Ed.2d 317 (1992) (debtor's experience rating not an interest extinguishable under section 363(f)); *In re Fleishman,* 138 B.R. 641, 647 (Bankr.D.Mass.1992) (right of first refusal is not

an interest in property); *In re Dartmouth Audio, Inc.,* 42 B.R. 871 (Bankr.D.N.H.1984) (franchise rights are not interest in property); *Jandel v. Precision Colors, Inc.,* 19 B.R. 415 (Bankr. S.D.Ohio 1982) (stock sale restrictions are not interests in property and stock cannot be sold free of those restrictions).

F.Supp. 631 (W.D.N.Y.1977); *Paris Manufacturing Corporation v. Ace Hardware Corporation (In re Paris Industries)*, 132 B.R. 504 (Bankr.D.Maine 1991); *American Living Systems v. Bonapfel (In re All American of Ashburn, Inc.)*, 56 B.R. 186 (Bankr.N.D.Ga. 1986). But they have also recognized that it was and is for the legislature to pass on this policy choice. It is left to the courts only to give effect to the policy choices already made in the existing statute. For better or worse, it does not appear that the current statute achieves all of these policy aims. The job of the courts is limited to ascertaining what policy choice Congress *did* make, not what policy choice Congress *should have* made.

And in fairness to the policy choices Congress apparently *did* make, section 363(f) does not need to reach beyond *in rem* interests in order to effectively achieve an appropriate bankruptcy result within the scope of the policies evinced in the current Code. We do not require a special provision to strip off interests that never attach in the first place.[6] Property is never "subject to" these interests absent the debtor's consent to a security interest or the creditor's attachment of the property resulting in a lien. Insofar as the estate is concerned, whatever "interests" such creditors might have in estate property can be effectively eliminated via an ordinary section 363(b) sale, without resort to the special "free and clear" mechanism found in section 363(f). *See* 11 U.S.C. § 363(b).[7]

Of course the other side of this observation is that, if the claims at issue here are prepetition claims against the estate, then they could conceivably have been eliminated by the sale of assets via section 363(b), *without* resort to section 363(f). Recognizing this, the defendants have argued vigorously that they do not hold prepetition claims. They also note that state law gives them independent claims against FAI under various successor liability theories, and that those claims could not have been discharged by either the sale or the confirmation of the plan in FAC. *See generally*, W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS (5th Ed.1984). Finally, they have maintained that they do not and never did have an "interest in property" via their successor liability actions. Their claims are *in personam*.

But this raises a deeper and far more important question. Can bankruptcy affect these sorts of claims at all? We turn to that question next.

## IV. Claims

To resolve this question, we must first be sure to understand the nature of the particular claim with which we are here presented. Then we must next determine whether it is in fact a "bankruptcy claim" within the meaning of section 101(5) of the Code. If it is, then we must determine whether the bankruptcy process could have affected this claim.[8] Finally, we must decide whether the bankruptcy process employed in this case did in fact affect this claim in a manner such as to cut off the ability of these defendants to maintain their action against FAI. We turn

---

**6.** The closest analogy outside bankruptcy to the position of unsecured creditors in bankruptcy is that of the judgment creditor who has yet to abstract or execute its judgment. Such a creditor has an enforceable judgment that will support remedies such as levies, garnishment, or attachment, but until such steps are actually taken, the judgment creditor has no actual interest in any particular property of its debtor. If the judgment creditor never takes the additional steps necessary to convert its claim from one against the debtor personally, *in personam*, to one against the debtor's property, *in rem*, the creditor cannot be said to have any interest in the debtor's property. Bankruptcy gives an unsecured creditor, via the proof of claim process, the functional equivalent of a judgment against the debtor's estate—but does not give the creditor an interest in any particular property of the debtor.

**7.** This result is not unlike the one which would be achieved by a sale of assets outside bankruptcy. If no *other entity* has an interest in the property, any purchaser outside of bankruptcy would take the property free and clear of *in personam interests*, not because of anything special about the sale, but because *in personam interests* do not attach to property and are not passed on. It is only when entities have interests in the subject property that section 363(f) is even necessary.

**8.** We shall see below that this issue is actually resolved in the process of determining whether the claim is a bankruptcy claim. *See* discussion *infra*.

to the first question, an understanding of the nature of this claim.

### A. Successor Liability

Successor liability has its antecedents in corporate law. In corporate law, the general rule has always been that the transfer of assets from one company to another does not pass on the debts or liabilities of the transferor, including liability for torts or products liability actions. *Upholsterers' International Union Pension Fund v. Artistic Furniture of Pontiac*, 920 F.2d 1323, 1326 (7th Cir.1990); *Conway*, 885 F.2d at 93. *See also* 15 W. Fletcher, *Cyclopedia of the Law of Private Corporations*, § 7122 (Perm.Ed. 1983). The general rule is not absolute, and four exceptions have been traditionally recognized. *Artistic Furniture*, 920 F.2d at 1326. A successor by purchase may be held liable for the debts or liabilities of its predecessor where: (1) there is an express or implied assumption of liability; (2) the transaction amounts to a consolidation, merger or similar restructuring of the two corporations; (3) the purchasing corporation is a "mere continuation" of the seller; or (4) the transfer of assets to the purchaser is for the fraudulent purpose of escaping liability for the seller's debts. *Id.* In recent years, a few courts have recognized a fifth exception, springing essentially from the nature of the defect and the product in question.[9] *See Dawejko v. Jorgensen Steel Co.*, 290 Pa.Super. 15, 18–19, 434 A.2d 106, 107–108 (1981); *Ray v. Alad Corp.*, 19 Cal.3d 22, 136 Cal. Rptr. 574, 560 P.2d 3 (1977).

Regardless the exception, successor liability does not *create* a new cause of action against the purchaser so much as it *transfers* the liability of the predecessor to the purchaser. Fletcher, *supra*, at § 7122; *see Golden State Bottling Co., Inc. v. NLRB*, 414 U.S. 168, 181–86, 94 S.Ct. 414, 423–26, 38 L.Ed.2d 388 (1973); *see also Northern Ins. Co. of New York v. Allied Mut. Ins.*, 955 F.2d 1353, 1357 (9th Cir.1992) (the liability of the predecessor is *transferred* to the successor); *Clark Equipment Co. v. Dial Corp.*, 25 F.3d 1384, 1387 (7th Cir.1994) (successor liability distinguished from personal and independent liability of the successor); *Preyer v. Gulf Tank & Fabricating Co., Inc.*, 826 F.Supp. 1389, 1395 (N.D.Fla.1993) (successor liability does not create new rights in the plaintiff); *Russell v. SunAmerica Securities, Inc.*, 1991 WL 352563 (S.D.Miss.1991) (liability of successor is coterminous with liability of predecessor; if predecessor is not liable then neither is successor). The nature of the liability itself does not change. Thus, while successor liability may give a party an alternative entity from whom to recover, the doctrine does not convert the claim to an *in rem* action running against the property being sold.[10] Nor does the claim have an existence independent of the underlying liability of the entity that sold the assets.

If this "claim" is in fact one properly characterized as a "claim" within the meaning of the Bankruptcy Code (i.e., a "bankruptcy claim"), then the sale of assets via the bankruptcy process could certainly transfer the assets free of any such *in personam* bankruptcy claims against the estate. What is more, we know from the nature of successor liability itself that a successor cannot legitimately be presumed to have "assumed"

---

**9.** There are three basic underlying justifications for the product line exception in products liability. 15 W. Fletcher, *Cyclopedia of the Law of Private Corporations*, § 7123.07 (Perm.Ed.1983). First, the plaintiff would have no other recovery than against the successor corporation. *Id.* Second, the successor corporation has a greater ability to spread the risk among future consumers of the same product. *Id.* Third, the successor corporation benefits from the assumption of the old corporation's good will and therefore should shoulder the burdens associated with those products. *Id.*

**10.** Though the argument that an *in rem* claim attached to the property is most sustainable

when successor liability is premised on the "fifth exception" discussed above. Under that exception, the successor is held liable not so much by virtue of the circumstances of the sale but by virtue of the nature of the liability itself and the nature of the product being manufactured. Yet even here, we must recall that, though the premise of holding the successor liability is drawn from these considerations, the essential feature of successor liability, *i.e.*, holding an entity personally liable for damages caused by the product, does not change. It is that essential feature that defines whether the claim is *in personam* or *in rem*.

claims that were already being handled in the bankruptcy process when the successor purchased assets out of a bankruptcy estate.[11] For this reason, we must turn our focus to what sort of claim, if any, the defendants can be said to have had against FAC, the predecessor entity. Here, importantly, we are speaking of claim in the bankruptcy sense, for it is only if the claims of the defendants can properly be said to have been the subject of the bankruptcy process that we can maintain that the bankruptcy court had any authority to issue orders affecting their rights. *Mooney*, 730 F.2d at 375.[12]

### B. *The Concept of a Bankruptcy Claim*

"Claim" is a specifically defined term under the Bankruptcy Code. It means "[a] right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." 11 U.S.C. § 101(5). According to the legislative history (quoted almost universally by virtually every court that has ever tried to construe the definition of claim found in the Code),

> The effect of the definition [of claim] is a significant departure from present law [i.e., the Bankruptcy Act]. Under present law, 'claim' is not defined in straight bankruptcy. Instead it is simply used, along with the concept of provability in section 63 of the Bankruptcy Act, to limit the kinds of obligations that are payable in a bankruptcy case. The term is defined in the debtor rehabilitation chapters of the [the Bankruptcy Code] more broadly. The definition ... adopts an even broader definition of claim.... By this broadest pos-

sible definition, and by the use of the term throughout title 11, especially in subchapter I of chapter 5, the bill contemplates that all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case. It permits the broadest possible relief in the bankruptcy court.

H.REP. 95, 95th Cong, 2d Sess 308–14 (1977), *reprinted in* 1978 U.S.CODE CONG. & AD-MIN.NEWS 5787, 6265–71 (1978).

Courts have struggled to give content to the extraordinarily broad definition of claim found in the Code, with an eye on the impact that bankruptcy now has on a given creditor who is held to have a "claim" in the bankruptcy case. On the one hand, all recognize that Congress fully intended to move away from the relatively restricted definition in the Act, toward a concept that would permit the bankruptcy process to accord broad and complete relief to debtors. After all, what's the point in having a remedy for financial restructuring that leaves a substantial portion of the debt outside the process? By the same token, however, more and more courts and commentators also recognize that the concept must have some limits. Due process, fundamental fairness, and the limits of subject matter jurisdiction all seem to mark the outer boundaries of the concept. Courts are still struggling with a formulation that reconciles these competing considerations.

The defendants have tried to argue that the Fifth Circuit's decision in *Mooney* is dispositive of this case, but, as an Act case, it sheds far less light on our problem than one might desire. To be sure, *Mooney* discusses the "outer limits" of the claim concept in terms of due process, but the circumscribed

---

11. Successor liability, the reader will recall, does not *create* a cause of action against the successor. It *transfers* the liability of the predecessor to the successor. If the predecessor is not liable, then neither is the successor. More importantly for our purposes, if the predecessor has a valid affirmative defense to the claim as of the sale of the assets, then the successor will be able to assert that same defense as a bar to liability.

Here's an example. Suppose the predecessor breached its contract with a supplier. Suppose further that the predecessor then sells its assets in such a fashion as to trigger successor liability. Finally, suppose that, prior to the sale, the stat-

ute of limitations ran on the supplier's cause of action for breach of contract. Successor liability does not resurrect a claim which, if asserted against the predecessor, would have been barred by limitations. Discharge in bankruptcy is but another affirmative defense, as would be a court-ordered sale of assets pursuant to section 363(b).

12. We here presage our answer to FAI's contention that the bankruptcy court could, under section 1123, enter orders affecting entities who did not hold claims against the estate. We answer that question in the negative, for reasons more fully explained later in this decision.

definition of claim in the Bankruptcy Act was *itself* dispositive of the issue there before the court. In *Mooney,* as in our case, persons injured in the crash of an airplane manufactured by the debtor sought to hold the purchaser liable. The plane was manufactured prepetition, the assets of the debtor were sold via the bankruptcy process "free and clear," and the injury occurred post-bankruptcy. *Mooney,* 730 F.2d at 375. In reversing the bankruptcy court's injunction in favor of the purchaser in *Mooney,* the Fifth Circuit said that the lower court lacked the ancillary jurisdiction to enter the injunction, because the prior sale order could not have affected the post-bankruptcy injury. Explained the court, those persons did not have "claims" at the time the sale order was entered. *Id.* at 374–3. The finding was mandated by the Act's rather restrictive definition of "claim," which required that a claim be "provable." *Id.* at 375 n. 6. Of course, the injured parties could not have *proved up* a claim from an injury that had yet to occur.

Because the definition of "claim" under the Bankruptcy Code has been broadened so substantially from its Act predecessor, we cannot simply embrace the *Mooney* holding to solve our problem, even though the nature of the liability in question is similar, because the underlying test has been changed.[13] With provability eliminated from the Code's definition of claim, and with even contingent, unliquidated, unmatured claims now swept into the bankruptcy process, courts have quickly discovered that "future claims" of a kind that never would have passed muster under *Mooney* could conceivably be treated in bankruptcy today. Certainly claims arising from injuries that manifest themselves anytime before confirmation come within the scope of the definition, even if both liability and damages are contested and unresolved. *Paris Manufacturing Corp. v. Ace Hardware Corp. (In re Paris Industries Corp.),* 132 B.R. 504, 508 (D.Maine 1991); *In re White*

*Motor Credit Corp.,* 75 B.R. 944, 947 (Bankr. N.D.Ohio 1987); *In re All American of Ashburn, Inc.,* 56 B.R. 186, 189–90 (Bankr. N.D.Ga.1986). And claims that hinge on a contingency are also included, even if the contingency has yet to occur. *See* H.R.REP. No. 595, 95th Cong., 1st Sess. 309 (1977), *reprinted in* 1978 U.S.CODE CONG. & AD-MIN.NEWS 5787, 5963, 6266. Courts have also found that claims that arise from some prepetition conduct of the debtor causing injury to the claimant, but which do not even manifest themselves until after the bankruptcy, may be claims treatable in the bankruptcy process. *See e.g., Matter of Johns–Manville Corp.,* 68 B.R. 618 (Bankr.S.D.N.Y.1986), *aff'd in part and rev'd in part,* 78 B.R. 407 (S.D.N.Y.1987), *aff'd sub nom., Kane v. Johns–Manville Corp.,* 843 F.2d 636 (2d Cir. 1988); *Grady v. A.H. Robins Company, Inc.,* 839 F.2d 198, 201–203 (4th Cir.1987). Each time courts revisit the issue, they find themselves having to reconfront the competing concerns of evincing Congress' intentions that the definition be given broad scope to assure that bankruptcy is an effective remedy, on the one hand, and of assuring that the entire process is fair (to say nothing of constitutional), on the other. The broader the reach, the greater the impact on notions of fundamental fairness. The more circumscribed by court-erected limitations, the greater the risk of doing violence to congressional intent.

An early effort at defining the reach of the Code's concept of claim offers an example of how easily the decisional process can get off track. The Third Circuit adopted what might be classified as a "state law accrual" test in *Frenville,* reasoning that the term "right to payment" found in the statute itself was synonymous with accrual of a right to be paid under state law. *Avellino & Bienes v. M. Frenville Co. (Matter of Frenville Co., Inc.),* 744 F.2d 332, 335–36 (3d Cir.1984),

---

**13.** The Fifth Circuit also observed, in *dicta,* that the relief being sought by the purchaser posed due process problems, though without any real analysis. Given the court's conclusion that the injured parties did not have claims in the bankruptcy sense, however, a basic piece was missing. For due process to be triggered, the court must first identify a protectible interest (life, lib-

erty or property) affected by the process. As of the date of the sale, an entity without a "claim" did not have a protectible interest. As of the date of the injunction, the injured party did have a protectible interest—but also was accorded due process. The due process discussion in *Mooney* thus is not only *dicta* but also a stalking horse.

*cert. denied,* 469 U.S. 1160, 105 S.Ct. 911, 83 L.Ed.2d 925 (1985). *Frenville's* reliance upon state law has been rightly criticized by other courts as being inconsistent with the intended breadth and scope of the statute and seems to have been rejected in all circuits save its place of origin. *See e.g. Grady v. A.H. Robins Company, Inc.,* 839 F.2d 198, 201 (4th Cir.), *cert dismissed,* 487 U.S. 1260, 109 S.Ct. 201, 101 L.Ed.2d 972 (1988).[14]

This criticism has also led to the formulation of a second test, often called the "conduct" 'test, because it looks to the conduct which gave rise to the claim to determine whether a bankruptcy claim has arisen. *Id. See also Waterman S.S. Corp. v. Aguiar (In re S.S. Waterman Corp.),* 141 B.R. 552 (Bankr.S.D.N.Y.1992), *vacated on other grounds,* 157 B.R. 220 (S.D.N.Y.1993); *Edge v. Roach (In re Edge),* 60 B.R. 690 (Bankr. M.D.Tenn.1986). Under this test, a claim will arise for bankruptcy purposes when the conduct which gave rise to the liability occurs, even though the injury resulting from that conduct may not occur or be manifested until after the commencement of the bankruptcy proceeding. *See Lemelle v. Universal Mfg. Corp.,* 18 F.3d 1268, 1275 (5th Cir.1994) (summarizing cases describing the "conduct" test).

Concerned about the broad sweep of the "conduct" test and its adverse impact on notions of fundamental fairness, several courts have devised yet a third approach, characterized as the "relationship" or "conduct plus" test. *See United States v. LTV Corp. (In re Chateaugay Corp.),* 944 F.2d 997, 1004–1006 (2d Cir.1991); *Lemelle,* 18 F.3d at 1277; *Piper,* 162 B.R. at 627.[15] The "relationship" test looks not merely to the conduct of the debtor, but to whether the

purported claimant had a specific and identifiable relationship with the debtor prepetition. *Beeter v. Tri–City Property Management Services, Inc. (In re Beeter),* 173 B.R. 108, 118 (Bankr.W.D.Tex.1994). It is not enough that the claimant's injury can be traced to the debtor's prebankruptcy conduct. The court must also inquire into the relationship of the debtor and the alleged claimant. *Id.* A claim for bankruptcy purposes will exist only where "some prepetition relationship, such as contact, exposure, impact, or privity, between the debtor's prepetition conduct and the claimant" is established. *Piper,* 162 B.R. at 627.

Principally relying upon *Piper,* the Fifth Circuit recently adopted a version of the "relationship" test in *Lemelle v. Universal Mfg. Corp.,* 18 F.3d 1268 (5th Cir.1994). In *Lemelle,* the plaintiff brought a wrongful death suit against Universal Manufacturing Corporation, an entity ultimately determined to be a successor to Winston Industries, Inc., the debtor. The suit was based upon Winston's defective design and manufacturing of a mobile home in 1970, twelve years prior to the debtor's bankruptcy. Universal moved for summary judgment on grounds that it was not the successor in interest and that the liability had been "discharged" in Winston's bankruptcy. The district court granted Universal's motion, but the Fifth Circuit reversed, remanding the case for further determination.

In *Lemelle,* the Fifth Circuit rejected both the "accrual" and the "conduct" tests, opting instead for some variant of the relationship test. *Id.* at 1277. Though *Lemelle* clearly requires as a threshold a showing of prepetition "relationship," the court declined to flesh out the contours of that concept. In fact,

---

**14.** Indeed, *Frenville* simply reintroduces the concept of provability back into the statute, in direct contravention of a clearly expressed congressional intent to dramatically expand the concept of claim beyond the provability standard of the Act. The language of the statute itself clearly expresses that departure, but any doubt about the issue is resolved by the legislative history, which goes to some length to explain the intentional departure as one of the most critical features of the new law. *See* H.R.Rep. No. 595, 95th Cong., 1st Sess 309 (1977), *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5963, 6266.

**15.** While clearly identifying a new test, identified in the opinion as the Relationship Test, the *Piper* court also attempted to reconcile its new test with the conduct test. *Piper,* 162 B.R. at 627. In fact, the court stated that the two tests were "not mutually exclusive" and that requiring the type of relationship required by *Piper* would not change the results in the majority of "conduct" test cases. The court then cited, *Waterman, A.H. Robbins* and *Edge,* three of the best known "conduct" test cases, for authority that a relationship requirement was implicit in all of their decisions.

while adverting to *Piper's* formulation (contact, privity, exposure or impact), the court stopped short of adopting that formulation. Indeed, the court says that a "relationship" might be based upon other factors than those listed in *Piper*, and that, on the other hand, a relationship established might nonetheless not be enough to make the claim a bankruptcy claim. *Id.; see Piper*, 168 B.R. at 439 (terms describing the phrase "prepetition relationship" are not exhaustive, and the "outer limits" of the phrase remain undetermined). The Fifth Circuit thus accurately senses that honoring the tension between fundamental fairness and congressional intent is far from mechanical.[16]

In leaving many doors still open, the Fifth Circuit has also left at least some hints about which direction it might take in a future case. Clearly, the court recognized the need, positively expressed in the Code's definition of "claim" that the process be as all-encompassing as possible in order to achieve a meaningful result. Especially in the reorganization context, the more loose ends left unattended by the process, the less likely the process is to achieve an effective result. That is precisely why the drafters employed such far-reaching language in section 101(5). *See Johnson v. Home State Bank*, 501 U.S. 78, 111 S.Ct. 2150, 115, L.Ed.2d 66 (1991); *Ohio v. Kovacs*, 469 U.S. 274, 279, 105 S.Ct. 705, 707, 83 L.Ed.2d 649 (1985). Indeed, the legislative history unmistakably states that the language employed was chosen so that "all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case. It permits *the broadest possible relief* in the bankruptcy court." H.R.Rep. No. 595, 95th Cong., 1st Sess. 309 (1977), *reprinted in* 1978 U.S.CODE CONG. & ADMIN.NEWS 5787, 5963, 6266.

Yet it is precisely that phrase, "the broadest possible relief" that suggests where the outer boundaries might be. We are limited to the possible. That may not sound like much of a limitation at first blush, but in fact it is a very effective, very practical statement of parameters. For what is possible is defined at least in part by what is fair. And *Lemelle* gives a sign or two that the Fifth Circuit senses that this is how we go about finding the limitations on the concept of bankruptcy claim. Specifically addressing the scenario in which both the injury and the manifestation of the injury take place simultaneously at a time after the confirmation of the debtor's plan, even though arising out of prepetition conduct, the court said:

> at a minimum, there must be evidence *that would permit the debtor to identify, during the course of the bankruptcy proceedings, potential victims* and thereby permit notice to these potential victims of the pendency of the proceedings.

*Id.* What kinds of claims can be bankruptcy claims, then? Perhaps whatever claims that it is *possible* to handle fairly in the bankruptcy process.[17]

This is an entirely new and different approach to the problem of future claims. It starts, true enough, by looking at the events that give rise to the claim, but it finishes by focusing less on the claim and more on the claimant. At the beginning of the inquiry, we are attentive to the clearly expressed intentions of the statute that the bankruptcy process sweep broadly and completely, to maximize the possibility of achieving an effective result. But by the end of the inquiry, we find ourselves most attentive to the other side of the dialectic, that of assuring that the process, whatever else it be, be fair.

This concern for procedural fairness is not new. A number of courts have been talking about it, though not perhaps in so many words. Without a doubt, that somewhat hidden agenda has influenced their resolution of what should and what should not be classified as a bankruptcy claim. *Lemelle*, 18 F.3d

---

**16.** It is worth noting just how much the court was reluctant to employ a mechanistic approach to the problem. Judge King, writing for the court, suggested that, even were a party to establish that a given claim was a bankruptcy claim, the court might nonetheless find that the claim was not discharged under section 1141(c), this

notwithstanding the sweeping language of that section. *See Lemelle,* at 1277.

**17.** Thus, the Fifth Circuit has, at least, implicitly overruled its holding in *Mooney* that the bankruptcy court *could not* affect liability such as this. *Lemelle,* 3 F.3d at 1217.

at 1274–75; *Chateaugay*, 944 F.2d at 1004; *In re UNR Industries, Inc.*, 725 F.2d 1111, 1120 (7th Cir.1984); *In re Amatex Corporation*, 755 F.2d 1034, 1043 (3rd Cir.1985); *Piper*, 162 B.R. at 628. The problem created by these cases has been that, with the real agenda unexpressed, the resulting analyses have had a decidedly vitriolic and unappealing quality about them, wholly inappropriate to the resolution of the problem.[18] They are not wrong in their concern for fundamental fairness. They are rather misdirected in their assumption that accommodating notions of fairness of necessity compels a restriction in the breadth of the concept of what *might be* a claim. In the process, they unavoidably do violence to congressional intent, and find themselves ignoring the express language of the statute. *Lemelle* suggests that that might not be necessary after all. We ought to be able to first give effect to the *broadest* definition of what *might be* a claim, then focus on what is *possible* in order to determine what is *in fact* a bankruptcy claim in any given case.

### C. Toward a New Dialectic

We ought here to retrace our steps a bit, then. If it is possible to resolve the future claims process by means of a dialectic that gives equal value to both thesis and antithesis, then we ought not be shy about fearlessly embracing each side. This is precisely what has been lacking thus far in the debate. The words of the legislative history, as it turns out, give us the decisional matrix. On the one hand, bankruptcy claims encompass the "broadest" relief for the estate. On the other, bankruptcy claims can go no further than what is "possible." Placed side by side, thesis and antithesis, we struggle Hegelian-style toward a synthesis that will best give expression to Congress' intentions when it crafted the notion of a "bankruptcy claim" in the Bankruptcy Reform Act of 1978. We turn first to how "broad" ought be the concept of claim.[19]

### 1. How Broad is Broadest?

 Taken at its word, the definition of claim implies the inclusion of every type of liability which could be traced to prepetition conduct. The definition includes all legal obligations no matter how *remote* or *contingent*. *See* H.R.REP. No. 595, 95th Cong, 1st Sess. 309 (1977), 1978 U.S.Code Cong. & Admin.News 5787, 5963, 6266. Remote is defined as "at a distance; afar off; inconsiderable; slight," and contingent is defined as:

> Possible, but not assured; doubtful or uncertain; conditioned upon the occurrence of some future even which is itself uncertain, or questionable. Synonymous with provisional.

Black's Law Dictionary (5th ed. 1979); *see also First City Beaumont v. Durkay (Matter of Ford)*, 967 F.2d 1047, 1051 (5th Cir.1992) (liability is contingent if debtor will be called upon to pay only upon the occurrence or happening of an extrinsic event).

These modifying terms will operate to sweep up virtually every liability which could be traced to the debtor's prepetition past. The legal obligation need only be *slight*, and need not be a *present interest*. It might merely be *not assured* and *doubtful or uncertain*. The definition easily includes liabilities which are *afar off* and *conditioned upon future events*. And the statute's legislative history instructs that the definition of claim include all legal obligations, *no matter* how remote or contingent. The term could thus encompass not only the types of liabilities in question here, or even those discussed in *Lemelle*, but even claims one could only *imagine* happening. What is more, they

---

**18.** Indeed, many of the arguments take on the quality of an *argumentum ad hominem*, with sneering attacks on bankruptcy courts and bankruptcy law being employed as a shorthand method of protecting injured parties from a perceived injustice. As it turns out, courts *ought* to be concerned about fundamental fairness when evaluating the bankruptcy process. But persuasion ought to take the place of passion.

**19.** The reader here is cautioned to trust the process. In describing the breadth of what claim *might* encompass, the court chooses to ignore the limitations that notions of fairness to the claimant immediately suggest. The reader will instinctively find herself supplying those limitations. That is a natural part of the dialectic process. But in reducing a description of the dialectic to writing, the words on the page will of necessity flow much more slowly than will the cognitive process of the reader. Be patient.

might not even be "legal" obligations as of the date of the filing.

The only natural limit is that "bankruptcy claim" by definition can extend no further than the confirmation of a debtor's plan (in a chapter 11 case). Claims that have their origin after that artificial date are deemed to be the post-confirmation debtor's problem.[20] The conduct formulation of the test found in the case law helps to remind us that the intended target of the reorganization process are those claims that have something to do with the debtor's prebankruptcy existence (or its in-bankruptcy experience). But the scope of the concept remains extraordinarily broad nonetheless, thanks to the qualifying terms in the statute, and the further explanations contained in the legislative history. What is swept up by the "broadest" aspect of the dialectic are simply whatever kinds of liabilities that have their antecedents in the debtor's prebankruptcy history.

And when one thinks about it, this makes good bankruptcy sense. If I borrow money from the bank today, I can reasonably anticipate having to pay it back some time. If I buy a thing, or a service, and use my credit card for the purchase, I can also expect at some point in the not too distant future to be billed for it. If I drive my car into someone's living room, I can expect eventually to be called upon to answer for the damages. If I promise to guarantee my brother's car debt, I can reasonably imagine that this promise might conceivably come home to roost someday, even though my brother currently seems like a nice guy and a family man. And if I sell widgets, every one of which has an unfortunate tendency to make people sick whenever they get within 50 feet of them, I can probably count on being sued at one point or another by somebody who gets too close to one of my widgets. All of these kinds of liabilities have their source in pre-bankruptcy history, though some are quite a bit more remote or contingent than others.

When one sits down to consider restructuring one's affairs, a responsible actor will seek to deal not only with today's bills but also with the liabilities that are likely to come up for one reason or another in the future, at least insofar as they are within the *fair contemplation* of the debtor. The Bankruptcy Code is intended to provide the same sort of practical remedy, to assure that any restructuring actually pursued will be one that is likely to actually be worth the trouble, one that is likely to effectively deal with the debtor's real economic problems. There's not much of a fresh start to a restructuring that makes no provision for significant liabilities that, though perhaps less quantifiable, are no less real in terms of their eventual impact on the debtor's future. Whatever sort of restructuring a responsible actor chooses to embark upon, whether it be simple budgeting for an individual, a major financial restructuring for a publicly traded corporation, or bankruptcy, that restructuring must take into account all the sorts of liabilities that are within the fair contemplation of a reasonable actor—both for the benefit of a fresh start for that actor, and to assure a method of payment for those who will be expecting that actor to answer for its debts.

In the case of a company such as Fairchild Aircraft Corporation, one of the many kinds of remote or contingent liabilities that of necessity arose out of its prebankruptcy activities was that associated with the possibility that at least one of the planes that it manufactured might fall out of the sky, for reasons ultimately attributable to something FAC did. Cigarette manufacturers face the same potential when they sell people tobacco products. Asbestos manufacturers "incurred" liability in the bankruptcy sense just by making products out of asbestos. In this analysis, it does not much matter whether the injury "occurs" before the bankruptcy filing or after confirmation. The definition of claim draws no such distinction and, for purposes of this aspect of the dialectic, we need not either. About all that we need do is to

---

**20.** Examples come immediately to mind. A manufacturing concern which, upon reorganization, commences new business postconfirmation will of course incur employee wage liabilities, trade debt, tax liability and the like, all attributable to the post-confirmation conduct of the reorganized debtor.

locate the source, the cause, the responsibility in the debtor's prebankruptcy past.[21]

### 2. The Realm of Possibility.

That establishes the thesis. Now for the antithesis. What sort of relief is "possible" in the bankruptcy context? Or to state it in a fashion more consistent with the tenor of the case law, what sort of relief is "not possible?"

"Claim" ought not do what is "not possible" in a court of law—it may not authorize courts to ride roughshod over due process and notions of fundamental fairness, for example. The bankruptcy process, after all, has its antecedents in equity. Pepper v. Litton, 308 U.S. 295, 303–4, 60 S.Ct. 238, 243–44, 84 L.Ed. 281 (1939). Courts have an affirmative duty to assure that the process, within the confines of the law, achieve a fair and equitable result.

 The immediate limitation this suggests is that, of necessity, no treatment which violates the due process rights of a claimant can be permitted to stand, regardless the purported breadth of the definition of bankruptcy claim (to say nothing of the breadth of provisions such as section 1141(c)). See Bank of Marin v. England, 385 U.S. 99, 87 S.Ct. 274, 17 L.Ed.2d 197 (1966); City of New York v. New York, N.H. Co., 344 U.S. 293, 73 S.Ct. 299, 97 L.Ed. 333 (1953). Even more important for our analysis, in addition to these constitutional constraints (which would be applicable regardless of the dialectic), the bankruptcy process ought to be fair in the broader, equitable sense. Not every conceivable obligation finding its source in the debtor's prebankruptcy

past is necessarily an obligation that can be fairly handled by the bankruptcy process. This is what the Lemelle court seems to have been getting at when it spoke of finding a "relationship" between the claimant and the debtor pre-bankruptcy. Lemelle, 18 F.3d at 1277. The court cautioned that a debtor in a given case will have to be able to sufficiently identify contingent liabilities such that the holders of such claims could be afforded some degree of procedural fairness before a court will call the claim a bankruptcy claim, i.e., one which not only has its antecedents in the debtor's prebankruptcy past but which also can be dealt with fairly by the bankruptcy process.

Bankruptcy is but an alternative device for dealing with our credit problems—in many ways of the same family as budgeting, cash flow projections, business plans, and raising equity capital. The process is designed to deal with what the debtor knows to be the debtor's needs, the debtor's problems. It is not designed, of course, to confer a windfall or a special status, an insulation against all the bad things that could happen in the future and which are really beyond the contemplation of the debtor. None of us are that lucky, nor should we be.[22] And that is part of the key. Bankruptcy cannot, and should not, do the impossible. It cannot and should not insulate a debtor from all of the bad things that could happen in the future. But it should give the debtor an effective device for dealing with today's problems.[23]

What about future claims? To return to our widgetitis example from earlier, we would be hard-pressed to call the injuries

---

**21.** Though it may go without saying, we emphasize here that a claimant would still have to affirmatively establish that the conduct in question as a matter of law would give rise to a claim eventually. Also, claims that are entirely outside the contemplation of the debtor, though arising from the debtor's prepetition conduct, are probably beyond the ken of "bankruptcy claim." It's difficult to imagine such a claim, because the availability of insurance coupled with the "foreseeability" common to most torts would all but eliminate any tort liability that is totally outside the contemplation of the debtor but originating in the pre-bankruptcy past from even being a tort at all. The same seems to be true for most contract claims that one can imagine. Perhaps environmental claims could conceivably fall into

this category, though the Second Circuit's decision in Chateaugay casts some doubt even there. United States v. LTV Corp. (In re Chateaugay), 944 F.2d 997, 1004–1006 (2d Cir.1991).

**22.** Though of course we would all like to be.

**23.** And we have learned already that "today's problems" can reach far into the future. For example, we earlier posited a widget manufacturer whose widgets had the unfortunate tendency to make people sick if they got too close. Precisely because we can define the problem, it is "today's problem," even though many of the actual injuries have yet to happen.

from widgetitis bankruptcy claims if the problem had never manifested itself before, and if the problem was so unanticipated that the debtor had (justifiably) not even insured against such injuries. They would not fall within the "fair contemplation" of the debtor. But if there has been a manifestation of the problem in the debtor's pre-bankruptcy past, then certainly that is one sort of claim that one would expect the bankruptcy process to address. Is it possible to address such claims in bankruptcy?

This brings us to the critical question left unanswered by *Lemelle*. Just what *is* capable of resolution in the bankruptcy process? The answer lies in the extent to which it is possible to deal with a given category of claims in a fashion that assures fundamental fairness in treatment.

■ Notions of fundamental fairness will not normally tolerate a potential claimant's rights being affected without its having had any way of participating in or being involved in the process. Yet, we also know, from looking at other kinds of proceedings outside of bankruptcy that courts can and do affect the rights of parties not before the court. That was the point made by Judge Easterbrook in *UNR Industries. UNR Indus.*, 20 F.3d at 770. The UCC cuts off the litigation rights of fraud victims using the doctrine of holder in due course, for example. *See* JAMES J. WHITE & ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE § 14–2, 14–6 (3rd ed. 1988).

Class actions provide us with the most telling parallel. It is often necessary that the final adjudication in a class action be made binding on parties not before the court. *See Hansberry v. Lee*, 311 U.S. 32, 41–42, 61 S.Ct. 115, 117–118, 85 L.Ed. 22 (1940); *Martin v. Wilks*, 490 U.S. 755, 760 n. 2, 109 S.Ct. 2180, 2184 n. 2, 104 L.Ed.2d 835 (1989). To achieve that end, the court may well craft a combination of devices, including publication notice and the appointment of a class representative. This is exactly what was done in the Agent Orange product liability litigation. *See In re Agent Orange Product Liability Litigation*, 996 F.2d 1425 (2d Cir.1993). A group of claimants there argued that they ought not be bound by the orders entered by Judge Weinstein in the class action, attacking all of the provisions put in place.

One of the things challenged there (just as it is challenged in this case) were the provisions for notice. The claimants maintained that they had not had an adequate opportunity to exclude themselves from the class of which they were, by definition, members. This, they said, violated their due process rights. The notice actually given in the case consisted of a publication in numerous newspapers and magazine thought to be read by veterans, informing them of the pendency of a class action and the methodology for opting out of that class. According to the notice, the suit was brought by individuals who had served in the armed forces of United States, New Zealand or Australia and who had been exposed to Agent Orange or "other phenoxy herbicides, including" the chemical name of the other compounds. The scope of exposure was anywhere between 1961 and 1972. Plaintiffs could include spouses and children of affected soldiers. While provisions for opting out in order to pursue independent claims for compensatory damages was made available, all persons defined to be in the class would be bound by the court's determination of punitive damages (i.e., no opt-out would be available). Opt-out had to be accomplished by May 1984 or the parties would be bound. Of course the parties before the Second Circuit alleged, *inter alia*, that their injuries had not manifested themselves by the cutoff date, so that they could not have known to opt out in time. That they were at risk because of their exposure was sufficient to bring them within the class, even though they might not have known they were at risk.

The Second Circuit nonetheless found the notice to be adequate, despite these deficiencies. Said the court:

"Due process, the courts have often declared, 'is a flexible concept,' intended to ensure 'fundamental fairness.'" *In re A.H. Robins Co.*, 880 F.2d 709, 745 (4th Cir.) (quoting *Walters v. National Ass'n of Radiation Survivors*, 473 U.S. 305, 320, 105 S.Ct. 3180, 3189, 87 L.Ed.2d 220 (1985) and *Mathews v. Eldridge*, 424 U.S. 319, 334, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976)), *cert. denied*, 493 U.S. 959, 110

S.Ct. 376, 377, 107 L.Ed.2d 362 (1989). What process is due in a given instance requires the balancing of a variety of interests. In some cases, "the marginal gains from affording an additional procedural safeguard ... may be outweighed by the societal cost of providing such a safeguard." *Walters, supra,* 473 U.S. at 320–21, 105 S.Ct. at 3189.

*In re Agent Orange Product Liability Litigation,* 996 F.2d at 1435.

The bankruptcy parallels are obvious. Suppose the defendants in the Agent Orange litigation had filed bankruptcy. They could as easily have defined a class of claimants to whom they were at least potentially liable, given prior injury claims. Not all members of the class would necessarily be known, for who could say which servicemen were in fact exposed to Agent Orange in the field? Nor would all claimants necessarily know they *were* claimants as of the relevant dates in the bankruptcy process, because some of their injuries might not yet have manifested themselves. Yet, to achieve finality in the process, and to permit the defendants to move on with their economic lives, some certain resolution would need to be made. If the selfsame procedures that were employed in the Agent Orange litigation were employed in the bankruptcy process, should not the process be found to be binding on claimants such as the appellants in *Agent Orange* just as surely as the process was found to be binding in the class action?

The Second Circuit's comments seem to suggest that the answer should be yes. Here is what the court said:

In the instant case, society's interests in the efficient and fair resolution of large-scale litigation *outweighs* the gains from individual notice and opt-out rights, whose benefits are conjectural at best. As appellants correctly note, *providing individual notice and opt-out rights to persons who are unaware of an injury would probably do little good.* Their rights are better served, we think, by requiring that "fair and just recovery procedures be[ ] made available to these claimants." 1 *Newberg, supra,* § 1.23, at 1–56, and *by ensuring*

*that they receive vigorous and faithful vicarious representation.*

*Agent Orange Product Liability Litigation,* 996 F.2d, at 1435 (emphasis added). Bankruptcy too seeks to achieve an "efficient and fair resolution" of what often parallels large-scale litigation, especially in the mass tort bankruptcies. That resolution might indeed "outweigh" the gains that might be obtained by some form of individualized noticing—precisely because the benefits in the bankruptcy context *are* conjectural. The alternative, after all, in the bankruptcy context, would be the liquidation of the enterprise, resulting in no compensation at all to any of the victims. The rights of such claimants might be "better served" by assuring that "fair and just recovery procedures [are] made available to these claimants." And if such procedures can be crafted in the class action context, they ought to be capable of implementation in bankruptcy as well.

To be sure, some sort of notice is indicated—mandated, in fact—by the case law in class actions. *See Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 176, 94 S.Ct. 2140, 2152, 40 L.Ed.2d 732 (1974); *Tulsa Professional Services, Inc. v. Pope,* 485 U.S. 478, 489–490, 108 S.Ct. 1340, 1347, 99 L.Ed.2d 565 (1988). Publication notice of the broadest sort feasible is certainly a common feature in many bankruptcy cases, as well, especially those involving mass tort victims. *See* Fed. R.Bankr.P. 2002(k); *see also In re GAC Corp.,* 681 F.2d 1295, 1300 (11th Cir.1982); *Brown v. Seaman Furniture Company, Inc.,* 171 B.R. 26, 27 (Bankr.E.D.Pa.1994); *In re Best Products Co, Inc.,* 140 B.R. 353, 357–59 (Bankr.S.D.N.Y.1992); *In re Eagle–Picher Industries, Inc.,* 137 B.R. 679, 682 (Bankr. S.D.Ohio 1992); *Charter International Oil Co. v. Ziegler (In re Charter Co.),* 113 B.R. 725, 727–29 (Bankr.M.D.Fla.1990); *In re Johns–Manville Corp.,* 36 B.R. 743, 754–55 n. 6 (Bankr.S.D.N.Y.1984), *aff'd,* 52 B.R. 940 (S.D.N.Y.1985). In our particular case, one might even imagine notices posted at the door of every Fairchild aircraft, advising that any claims arising out of the manufacture of the aircraft are to be (have been?) dealt with in bankruptcy. But that the notice might not in fact reach a given claimant in time for that claimant to do anything about it was not, of

itself, decisive in the *Agent Orange* case. That "defect" might be offset by other societal needs, especially where it was clear that such notice, if given, "would probably do no good." Further, the "defect" might be counterbalanced by "vigorous and faithful vicarious representation." For persons whose injuries have yet to "manifest" themselves, such notice would be far from perfect. But under the circumstances, and given the countervailing social policy of assuring at least some payment for the broadest range of persons, that might be all the notice required. *See Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 316–18, 70 S.Ct. 652, 658–59, 94 L.Ed. 865 (1950). The same can be said of bankruptcy cases.

The more important consideration is whether it is possible to design "fair and just recovery procedures" in the bankruptcy process, as it was evidently possible to do in the class action context. Many of the mass tort bankruptcy cases have given heed to the class action model, employing a "class representative" for the members of the class, including those members who might not even know they are members. Such a representative was appointed in both *Johns–Manville* and *A.H. Robins. See Matter of Johns–Manville Corp.,* 68 B.R. 618 (Bankr.S.D.N.Y. 1986), *aff'd in part and rev'd in part,* 78 B.R. 407 (S.D.N.Y.1987), *aff'd sub nom., Kane v. Johns–Manville Corp.,* 843 F.2d 636 (2d Cir. 1988); *In re A.H. Robins Co.,* 88 B.R. 742, 744 (E.D.Va.1988), *aff'd sub nom., Menard–Sanford v. Mabey (In re A.H. Robins Co.),* 880 F.2d 694 (4th Cir.), *cert. denied,* 493 U.S. 959, 110 S.Ct. 376, 107 L.Ed.2d 362 (1989). A similar representative was appointed in the Agent Orange litigation, and the employment of that device was a critical factor in the court's ultimate conclusion that the process employed was fundamentally fair and did not violate the due process rights of the claimants there. Said the court:

> It is axiomatic that a class action binds absent members only so long as they were adequately represented therein. *See generally Hansberry v. Lee,* 311 U.S. 32, 41, 61 S.Ct. 115, 118, 85 L.Ed. 22 (1940). Our

decision in *Eisen v. Carlisle & Jacquelin,* 391 F.2d 555 (2d Cir.1968), describes the requisites of adequate representation as follows:

> [A]n essential concomitant of adequate representation is that the party's attorney be qualified, experienced and generally able to conduct the proposed litigation. Additionally, it is necessary to eliminate so far as possible the likelihood that the litigants are involved in a collusive suit or that the plaintiff has interests antagonistic to those of the remainder of the class.

> *Id.* at 562. . . . We agree with the district court that designation of a subclass of future claimants and appointment of a guardian to represent their interests was unnecessary "because of the way [the settlement] was structured to cover future claimants."

*Agent Orange Products Liability Litigation,* 996 F.2d, at 1435–36.

Bankruptcy shares common features with this sort of class action. Here too the law permits the putatively liable party to come down quickly to the bottom line, estimate the total liability, make appropriate provision for it, and thereby be permitted to move on with it's economic life. Here too, the interests of some creditors may well have to be handled not directly (because practical realities make that impossible) but indirectly, via a representative. The procedure was ratified in *Agent Orange,* and withstood due process scrutiny. A similar kind of process, employed in a very similar context, *i.e.,* the bankruptcy of an entity with products liability exposure, ought to enjoy the same ratification.

Bankruptcy almost always involves at least some creditors whose individual identities might not be known to the debtor, even though the debtor can identify a known group of *likely* claimants who, within a statistical certainty, will be (or already have been) injured by the debtor's prepetition conduct. The critical question always for such types of claimants[24] is affording them a meaningful

---

24. There is a real question whether future claimants have, as of the date of the plan confirma-

tion, a cognizable property interest that warrants constitutional protection. *See Logan v. Zimmer-*

opportunity to participate in the process, such that the process can actually effectuate meaningful relief for the debtor. The debtor in restructuring its financial affairs will want to take account of these anticipated liabilities along with its other, more quantifiable liabilities lest the process be doomed to failure from the start, for the anticipated liabilities are no less real for being less quantifiable. But meaningful relief for the debtor must of necessity affect the collection rights of future claimants. So long as those rights are affected in a manner that comports with notions of fundamental fairness, the debtor ought to be able to bind those claimants, in much the same way as members of a class in a class action may be bound. If the debtor can achieve this end, then the claims ought to be thought of as "bankruptcy claims," and ought to be bound by the bankruptcy process.

We have posited the "legal representative" as one device for assuring fundamental fairness for future claimants. It may not be the only way, of course. Each case will turn on its own facts. We know, for example, that a non-party could be bound to a prior judgment, where the non-party's interests have been represented in the proceeding by a person with similar rights or interests. *Meza v. General Battery Corp.*, 908 F.2d 1262, 1266 (5th Cir.1990); *Benson and Ford, Inc. v. Wanda Petroleum Co.*, 833 F.2d 1172, 1174 (5th Cir.1987). A non-party may also be bound to the issues resolved in a prior suit where the non-party's interests were "so closely aligned with the interests" of a party that the non-party's interests can be held to be "virtually represented." *Meza*, 908 F.2d at 1266 (citing *Aerojet–General Corp. v. Askew*, 511 F.2d 710, 719 (5th Cir.), *appeal*

*dismissed*, 423 U.S. 908, 96 S.Ct. 210, 46 L.Ed.2d 137 (1975)). The point is not that one or another method is guaranteed to achieve fundamental fairness, but rather that whatever method is chosen to meet the peculiar circumstances must, in the process, achieve fundamental fairness in the manner in which it deals with remote claims such as these.

### 3. *Synthesis of the Dialectic*

 We thus reach the *denouement* of our dialectic. It is indeed possible to synthesize the antipodal notions of broad scope and fair treatment to arrive at a sensible and workable definition of bankruptcy claim. Congress was not, after all, posing an impossible conundrum. Instead, Congress sought and succeeded in devising a definition of claim that would both assure an effective mechanism for reorganization and a fair treatment of creditor interests. The definition of bankruptcy claim under section 101(5), as construed by the Fifth Circuit in *Lemelle*, must be sufficiently broad to include liabilities first manifesting themselves post-confirmation where the conduct which caused the injury occurs prepetition. But the selfsame definition is also restricted to those claims to which it is also possible[25] to accord fair representation of their interests in the course of the case. *Lemelle* requires a debtor to take affirmative steps to bring these types of claimants into the bankruptcy process with appropriate protections to assure a level of procedural fairness. The debtor must demonstrate to the bankruptcy court that it had sufficient knowledge of the nature and scope of the claims to be obligated to fairly anticipate having to provide for them

man Brush Co., 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982); *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Ducharme v. Merrill–National Laboratories*, 574 F.2d 1307 (5th Cir.1978). One can hardly complain about losing what one never had. However, in our analysis, we must assume that future claimant *do* have property interests, for our entire inquiry is premised on the notion that, to be affected at all by the bankruptcy process, they must have bankruptcy claims. If they do not have bankruptcy claims, then, under *Lemelle*, the bankruptcy can have no affect on them. But if they do have bankruptcy claims, then they also, *ipso facto*, have cogniza-

ble property interests that are affected by the bankruptcy process. The court appreciates the circularity inherent in this analysis (one has a claim only if one can be afforded due process; one is entitled to due process because one has a claim). But under *Lemelle*, there is no way to avoid it.

25. Actually, we know that *Lemelle* will require more than a showing that "it was possible." A debtor seeking to cut off the post-confirmation assertions of creditors such as we find here is also going to have to demonstrate how the debtor *in fact* addressed that class of claims in a manner deemed "fundamentally fair" by the courts.

as part of its financial restructuring, that these types of claims were indeed bankruptcy claims because it was [26] practically and equitably possible to deal with such liabilities as claims, and that such claims were in fact dealt with fairly and responsibly. This is what we take the Fifth Circuit to have meant when it insisted that the debtor demonstrate a prepetition "relationship" with the potential victims such that it was possible for the court to practically deal with the claimants in the bankruptcy.

There can be no doubt that the general policy of assuring a debtor's "fresh start," as well as the reorganizational policy of "saving going concern value" are furthered by the broadest definition of the term claim. Bankruptcy is meant to separate the past and the future of an enterprise for those purposes. *UNR Indus.*, 20 F.3d at 771. Claims attributable to yesterday's activities ought to be satisfied out of existing assets, which will in turn enable a business with positive value to move onward without the burden of its prior blunders. *Id.* By the same token, as it is the debtor that is the intended beneficiary of this policy, it is also appropriate that substantial responsibility be imposed on the debtor to assure fair and equitable treatment of the creditors whose interests will necessarily be affected. *Waterman Steamship,* 141 B.R. at 558; *See In re Savage Industries, Inc.,* 43 F.3d 714, 717 (1st Cir.1994) (no provision made for the interests of contingent product liability claimants).

With the conclusion of the dialectic, we have also come full circle, and find ourselves returning to the Fifth Circuit's analysis in *Mooney.* Given the Code's substantially broadened definitions, it is indeed possible for the bankruptcy process to deal with "future claims" of the sort outside the range of bankruptcy under the Act. But *Mooney* also (justifiably) asked whether the bankruptcy process *did in fact deal with* the future

claims of the sort there under consideration. And the same question ought to be asked today when we are evaluating whether a given claim is in fact a bankruptcy claim. We now turn to that critical inquiry.

### D. Applying the lessons learned

In the present case, there is no dispute that the injuries alleged arose out of the prepetition conduct of FAC. The basis for successor liability is the debtor's manufacture and sale of allegedly defective aircraft, which must have occurred at least five years prior to the bankruptcy (if it occurred at all). Nor is there any dispute that the injuries occurred post confirmation and that the manifestation of those injuries occurred simultaneously with the injury. The undisputed facts also show that the debtor (actually in this case, the trustee) did not take the necessary steps to establish these liabilities as claims in the bankruptcy proceeding either directly or indirectly (though perhaps they could have been included). No claims were ever filed on behalf of these persons, and at no time did any party attempt to have a legal representative appointed. These claimants *could have been* claimants in the bankruptcy sense, for the debtor certainly had enough information to know that some of its planes might fall out of the sky, and that people injured or killed in those crashes would likely attempt (perhaps justifiably) to hold FAC responsible. The debtor could have, with a fair amount of precision, even estimated the number of such aircraft likely to crash, and the number of persons likely to be injured as a result. And the trustee could have then taken the steps that were taken in *A.H. Robins* and *Johns–Manville* to appoint a legal representative for these interests whose task it would have been to assure that appropriate steps were taken to protect or provide for those interests.[27]

---

26. We say "was" because, as a practical matter, the efficacy of the procedures employed will not be tested until a challenge such as this is launched. In this regard, the process is quite similar to what occurs in class action cases, where the efficacy of the notices and orders entered in the class action are first tested when a given litigant seeks to escape the bar presented by the class action orders.

27. It is not necessary here to spell out what those steps might have been. Each case must turn on its own facts, and will be affected in no small part by the nature of the reorganization proposed. The defendants in this case suggested that FAC might have, as part of its plan, arranged for some sort of insurance as part of the sale. FAI contends that such insurance, if required, would have chilled the purchase or have

Because these steps were not taken, though they could have been, these alleged claims cannot, at the end of the day, be treated as "bankruptcy claims." To reiterate our dialectic, while the claims fit the thesis, they falter on the antithesis.

The court's conclusion that the defendants did not have bankruptcy claims leads to the further conclusion that the bankruptcy court's order confirming the plan could not have affected these liabilities. Sections

substantially reduced the sales price obtained. That is probably true, but then that is simply a reflection of the economic reality that, for the debtor to have obtained effective relief *vis-a-vis* these particular kinds of bankruptcy claims, it would have been obligated to make some sort of provision for their interests. What result would ultimately have been negotiated is, at this point, gross speculation, for we do not know how the parties might have behaved had they had to deal with a legal representative zealously representing the interests of its constituents.

28. FAI further argues that, even if these "future claimants" did not hold bankruptcy claims, certain sections of the Bankruptcy Code implicitly, if not expressly, give the bankruptcy court the authority to order the release of third-party liabilities as well the ability to enjoin future claimants. These sections include section 105, which grants the bankruptcy court the power to enter orders, process, or judgments that are necessary *to carry out* the provisions of Title 11, section 1123(b)(4), which allows a plan to provide for all or substantially all of the property of the estate, and section 1123(b)(5), which allows a plan to contain any other *appropriate* provision *not inconsistent* with the applicable provisions of Title 11. According to FAI, the combination of these three provisions provide the necessary mechanism for the bankruptcy court to release third-party purchasers from all liabilities regardless of their character and provide for an injunction against the pursuit by "future claimants," all as part of a debtor's plan of reorganization.

The court recognizes that, in certain circumstances, the release of third-party liability in a debtor's plan of reorganization has been held to have binding affect. *See Matter of Specialty Equipment Companies, Inc.*, 3 F.3d 1043, 1046–47 (7th Cir.1993); *Republic Supply Co. v. Shoaf*, 815 F.2d 1046, 1050 (5th Cir.1987) (release of co-debtor/co-obligor binding upon creditor who failed to object to debtor's plan based upon *res judicata* ). Courts have also taken this one step further by providing for an injunction against creditors or claims holders pursuing a co-debtor or co-obligor in the debtor's plan of reorganization. *In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930 (Bankr.W.D.Mo.1994); *In re Heron Burchette, Ruckert & Rothwell*, 148 B.R. 660 (Bankr.D.Dist.Col.1992). Similar injunctions

1141(a), 1141(c) and 1141(d) could have provided the relief suggested by FAI, but those sections all have one limiting characteristic in common. Before one can be bound by a plan, have property transferred free and clear or their interest or be subject to the debtor's discharge, the person must hold a "bankruptcy claim." Since, these liabilities cannot properly be considered claims, these sections have no affect on the liabilities. *Mooney*, 730 F.2d at 375.[28]

against "parties in interest" or claims holders have been used by courts confronting the issue of mass tort to protect the debtor's discharge and reorganization. *See In re A.H. Robins Co.*, 88 B.R. 742, 744 (E.D.Va.1988), *aff'd sub nom.*, *Menard–Sanford v. Mabey* (*In re A.H. Robins Co.*), 880 F.2d 694 (4th Cir.), *cert. denied*, 493 U.S. 959, 110 S.Ct. 376, 107 L.Ed.2d 362 (1989) (court entered injunction against claimants pursuing any other entity other than an established claimants trust); *Matter of Johns–Manville Corp.*, 68 B.R. 618, 624 (Bankr.S.D.N.Y.1986), *aff'd in part and rev'd in part*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom.*, *Kane v. Johns–Manville Corp.*, 843 F.2d 636 (2d Cir.1988) (injunction against "parties in interest" treated as claimants in the bankruptcy from pursuing entity other than trust).

Certainly the court enjoys broad equitable powers under section 105. *Chiasson v. J. Louis Matherne and Associates* (*Matter of Oxford Management, Inc.,*), 4 F.3d 1329, 1334 (5th Cir.1993) (bankruptcy court is provided with broad equitable powers to fashion orders necessary to further the substantive provisions of the bankruptcy code). These equitable powers include the power to enter a release or issue an injunction. *Id.* But a court cannot use its equitable powers in absolute contravention of the Bankruptcy Code or well established legal principles. *Oxford Management*, 4 F.3d at 1334 (section 105 does not authorize a bankruptcy court to create substantive rights, or constitute a roving commission to do equity). In each of the cases in which a court has released a third party or enjoined the prosecution of claims against a third party, the persons subject to the release or injunction were either creditors in the bankruptcy case or had their interests represented by another. *See Specialty Equip.*, 3 F.3d at 1045 (party affected by the release was a creditor in the bankruptcy case); *A.H. Robins Co.*, 880 F.2d at 698 (party affected by the injunction were claimants in the bankruptcy proceeding, represented by legal representative); *Shoaf*, 815 F.2d at 1050–51 (parties subject to the release creditors in the bankruptcy proceeding); *Master Mortg.* 168 B.R. at 939, 940 (group affected by the permanent injunction creditors in the bankruptcy case); *In re Johns–Manville Corp.*, 36 B.R. 727, 741–42 (Bankr. S.D.N.Y.), *appeal denied*, 39 B.R. 234 (S.D.N.Y. 1984) (persons subject to injunction given "party in interest" status, and rights protected in the

## Conclusion

We have struggled here with one of bankruptcy's more intractable conundrums. Future claims issues remind us that bankruptcy, if it is to be an effective remedy, must extend to cover all the liabilities a given debtor knows it is facing, even those liabilities whose contours are fuzzy. Yet future claims also remind us that bankruptcy is not a panacea. It cannot achieve all ends imagined. Like all other federal remedies, it is cabined by notions of due process and fundamental fairness. We have, in our struggle, looked beyond bankruptcy, and have found analogies in other corners of federal jurisprudence. In class actions, especially, we have discovered that both the means and the ends of that process, while not identical to bankruptcy, are remarkably similar. The cases which have upheld the class action remedy reassure us that we are on the right track here as well.

Regretfully, the successor in this case cannot enjoy the fruits of our analysis. That is really noone's fault. How, after all, could any of the litigants in this case know how these issues would shake out back in 1990, before the Fifth Circuit had ever spoken on the issue.[29] Yet it is the nature of the beast that, in all likelihood, it will never be possible for a debtor emerging from bankruptcy (or any successor entity), to know of a certainty that the provisions of a given plan will effectively cut off claimants such as these unless and until a challenge is mounted. In no other way can the due process rights of such claimants be fully vindicated.[30]

The order of sale did not insulate FAI, and this court lacked the jurisdiction to enjoin these claimants, because they did not hold "bankruptcy claims" as defined in this decision. Summary judgment must be denied to plaintiffs, and entered in favor of defendants. An order will be entered consistent with this decision.

---

bankruptcy proceeding by providing a legal representative).

The court's conclusion that the injunction and plan confirmation order in this case do not bind these defendants does not limit a bankruptcy court's general authority to issue appropriate relief under section 105. We merely hold (rather unremarkably, it might be added) that the such a release or injunction may not be given effect when it purports to bind a party who did not hold a bankruptcy claim, either directly or indirectly. This holding does not alter the equally valid assertion that courts, in the confirmation process, may enter releases or injunctions, release third party liability, and even enjoin the prosecution of actions against third parties where the release or injunction is necessary for a debtor's reorganization. Section 105 could even affect persons who are not creditors in the bankruptcy case, provided that the persons' interests are protected during the bankruptcy proceeding. Congress has said as much in its 1994 amendments to the Bankruptcy Code. See 11 U.S.C. § 524(g). But the court's authority under section 105 is not limitless. That section does not, of itself, authorize a court to eliminate the future rights of persons who are not in any way before the court. Allowing this would be tantamount to allowing a party to obtain a declaratory judgment that their adversary's rights were barred without giving the adversary notice of the proceeding, an action which is precluded by accepted legal principles. Texaco v. Short, 454 U.S. 516, 536, 102 S.Ct. 781, 796, 70 L.Ed.2d 738 (1982).

29. Keep in mind that Mooney was an Act case.

30. The approach suggested in this case has many pluses, the most significant of which is its reconciliation of the legislative history of section 101(5) with the expressed concerns of the circuit courts about fairness in the process. The approach also serves, perhaps, to reduce the "temperature" of the issue, moving the debate from venomous attacks on the bankruptcy system to the "higher ground" of locating the bankruptcy process in the larger matrix of federal jurisprudence. But the approach leaves many questions unanswered as well. How much notice is enough notice? When is a legal representative indicated? Should classes of claimants be defined in the same manner as classes in class actions are now defined? Should there be a fairness hearing, as there now is in class actions? Will the analysis change in the chapter seven context? Whether the approach to the problem outlined in this decision attracts any adherents will depend in no small part on whether these difficult questions can be adequately addressed.